# Exhibit 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :

NATIONAL FAIR HOUSING ALLIANCE;    :
FAIR HOUSING JUSTICE CENTER, INC.;  :
HOUSING OPPORTUNITIES PROJECT FOR :
EXCELLENCE, INC.; FAIR HOUSING    :
COUNCIL OF GREATER SAN ANTONIO,  :
                                          :

                   Plaintiffs,    :
                                          :

            - against -         :         18 Civ. 2689 (JGK)
                                          :

FACEBOOK, INC.,                     :
                                          :

                 Defendant.    :
                                          :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

 

## STATEMENT OF INTEREST
## OF THE UNITED STATES OF AMERICA

 

                                              GEOFFREY S. BERMAN
                                              United States Attorney for the
                                              Southern District of New York
                                              86 Chambers Street, Third Floor
                                              New York, New York 10007
                                              Tel.: (212) 637-2733
                                              Fax: (212) 637-0033
                                              Email: david.kennedy2@usdoj.gov

ELLEN BLAIN
DAVID J. KENNEDY
JACOB LILLYWHITE
CHRISTINE POSCABLO
Assistant United States Attorneys
       - Of Counsel -

## TABLE OF CONTENTS

INTEREST OF THE UNITED STATES ........................................................................1

PRELIMINARY STATEMENT ..................................................................................2

BACKGROUND ........................................................................................................3

A.    Plaintiffs Allege That Facebook Classifies Its Users, Solicits Demographic and Other Preferences from Advertisers, and Then Implements Those Preferences by Including or Excluding Certain Users ....................................................................................................3

B.    Facebook's Advertising Practices Become Public ...................................................6

C.    Facebook Amends Its Targeting Technology in 2017 ..............................................7

ARGUMENT ............................................................................................................9

PLAINTIFFS HAVE STATED A CLAIM AGAINST FACEBOOK FOR VIOLATIONS OF THE FAIR HOUSING ACT ................................................................9

    A.    The Legal Framework ........................................................................................9

        1.    The Fair Housing Act and Implementing Regulations ...............................9

        2.    The Communications Decency Act ..........................................................13

        3.    Websites Are Not Entitled to Immunity Under the Communications Decency Act When They Act As "Content Providers" ..........................14

    B.    Plaintiffs Have Sufficiently Alleged that Facebook Is a "Content Provider" Not Entitled to Immunity Under the CDA ..................................................................17

        1.    Plaintiffs' Allegation That Facebook Mines User Data to Create Categories for Advertisers to Target or Exclude ......................................17

        2.    Plaintiffs' Allegation That Facebook Invites Advertisers to Target Certain Users Based on Unlawful Criteria.................................................21

        3.    Plaintiffs' Allegation That Facebook Uses Its Algorithms to Deliver Discriminatorily Targeted Ads .................................................23

CONCLUSION........................................................................................................25

CERTIFICATE OF COMPLIANCE...........................................................................26

# TABLE OF AUTHORITIES

**CASES**                                                 **PAGE**

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................3

*Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690 (S.D.N.Y. 2009) .................19

*Bragdon v. Abbott*, 524 U.S. 624 (1998) .....................................................................7

*Brooklyn Center for Independence of Disabled v. Bloomberg*,
    980 F. Supp. 2d 588 (S.D.N.Y. 2013)...............................................................1

*Cabrera v. Jakabovitz*, 24 F.3d 372 (2d Cir. 1994) ........................................................9

*Chicago Lawyers' Comm. For Civil Rights Under Law, Inc. v. Craigslist, Inc.*,
    519 F.3d 666 (7th Cir. 2008) ...................................................................14

*Cohen v. Facebook*, 252 F. Supp. 3d 140 (E.D.N.Y. 2017) ...............................................16

*Cross v. Facebook, Inc.*, 14 Cal. App. 5th 190 (1st Dist. 2017) ....................................16

*Disabled in Action v. Board of Elections of the City of New York*,
    752 F.3d 189 (2d Cir. 2014) .....................................................................1

*Fair Housing Council v. Roommates.com, LLC*,
    521 F.3d 1157 (9th Cir. 2007) ...........................................................13-16, 18-19, 22-24

*Fair Housing Council v. Roommate.com*, 666 F.3d 1216 (9th Cir. 2012) ...................................15

*Fed. Trade Com'n v. Accusearch Inc.*, 570 F.3d 1187 (10th Cir. 2009) .....................................21

*Fed. Trade Com'n v. LeadClick Media, LLC*, 838 F.3d 158 (2d Cir. 2016) ...........................15-16

*Force v. Facebook*, 16-CV-5158 (NGG) (LB), 2018 WL 472807
    (E.D.N.Y. Jan. 17, 2018) .....................................................................16

*Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785 (N.D. Cal. 2011)...............................3, 17, 19-20

*Guevara v. UMH Props., Inc.*, No. 2:11–cv–2339–SHL–tmp, 2014 WL 5488918
    (W.D. Tenn. Oct. 29, 2014) .....................................................................12

*Herrick v. Grindr, LLC*, 306 F. Supp. 3d 579 (S.D.N.Y. 2018) ...................................22

*Housing Opportunities Made Equal v. Cincinnati Enquirer, Inc.*, 731 F. Supp. 801
    (S.D. Ohio 1990), *aff'd*, 943 F.2d 644 (6th Cir. 1991) .............................12-13

*Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014) ................................................16

*Martinez v. Optimus Props., LLC*, Case Nos. 2:16–cv–08598–SVW–MRW,
    2017 WL 1040743 (C.D. Cal. Mar. 14, 2017) ................................................12

*MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, No. CIV.A.3:02-CV-2727-G,
    2004 WL 833595 (N.D. Tex. Apr. 19, 2004) ................................................19

*MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581 (2d Cir. 2016) ...........................9

*Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222 (N.D. Cal. 2014) ................................21

*Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898 (2d Cir. 1993) ........................11

*Ragin v. N.Y. Times Co.*, 923 F.2d 995 (2d Cir. 1991) ................................................11

*Ricci v. Teamsters Union Local 456*, 781 F.3d 25 (2d Cir. 2015) ..........................13-14

*Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31 (2d Cir. 2015) ...............................11

*Selevan v. New York Thruway Authority*, 584 F.3d 82 (2d Cir. 2009) ............................3

*Twombly v. Bell Atl. Corp.*, 550 U.S. 544 (2007) ...........................................................3

*United States v. Hunter*, 459 F.2d 205 (4th Cir. 1972) ................................................11

*United States v. Space Hunters, Inc.*, 429 F.3d 416 (2d Cir. 2005) ..............................11

## FEDERAL STATUTES AND REGULATIONS

28 U.S.C. § 517 ................................................................................................................ 1

42 U.S.C. § 3601 .............................................................................................................. 9

42 U.S.C. § 3604 ...................................................................................................... *passim*

42 U.S.C. § 3610 ...............................................................................................................1

42 U.S.C. § 3612 ...............................................................................................................1

42 U.S.C. § 3614 ...............................................................................................................1

47 U.S.C. § 230 ...................................................................................................... 2, 13-14

24 C.F.R. § 100.75 ....................................................................................................10

24 C.F.R. § 100.80(b)(4) ..........................................................................................12

45 Fed. Reg. 57,104 (Aug. 26, 1980) .......................................................................10

The United States, by its attorney, Geoffrey S. Berman, United States Attorney for the Southern District of New York, respectfully submits this Statement of Interest, pursuant to 28 U.S.C. § 517, in support of Plaintiffs National Fair Housing Alliance, Fair Housing Justice Center, Inc., Housing Opportunities Project for Excellence, Inc., and Fair Housing Council of Greater San Antonio ("Plaintiffs"), regarding the potential liability of defendant Facebook, Inc. ("Facebook") under the Fair Housing Act, 42 U.S.C. § 3601 *et seq*.

## INTEREST OF THE UNITED STATES

Facebook's motion to dismiss involves significant questions regarding the application of the Fair Housing Act ("FHA"). The Justice Department and the Department of Housing and Urban Development share responsibility for the enforcement of the FHA. *See, e.g.*, 42 U.S.C. §§ 3610, 3612, 3614. The United States frequently files Statements of Interest in cases concerning the applicability and interpretation of federal law in which it has enforcement interests. *See, e.g.*, *Brooklyn Center for Independence of Disabled v. Bloomberg*, 980 F. Supp. 2d 588, 641 n.9 (S.D.N.Y. 2013) (noting statement of interest filed in Americans with Disabilities Act challenge to NYC emergency planning procedures); *see also Disabled in Action v. Board of Elections of the City of New York*, 752 F.3d 189, 194-95 (2d Cir. 2014) (noting appearance of United States to propose remedial plan to address lack of accessible election facilities in Americans with Disabilities Act case).

On August 14, 2018, HUD served an administrative complaint against Facebook for conduct similar to that alleged in the First Amended Complaint ("Complaint"), alleging violations of Sections 3604(a), (b), (c), and (f) of the FHA.

## PRELIMINARY STATEMENT

The Complaint alleges that Facebook's classification of its users and its ad targeting tools permit landlords, developers, and housing service providers to limit the audience for their ads based upon characteristics that, Plaintiffs claim, are outright prohibited by the FHA, including sex, religion, familial status, and national origin, and pretexts for protected characteristics. These allegations are sufficient to state a claim under the FHA.

Facebook's argument that the Communications Decency Act, 47 U.S.C. § 230 *et seq.* ("CDA") immunizes it from the FHA rests on the faulty premise that it is merely an interactive computer service. To the contrary, the Complaint sufficiently alleges that Facebook is an internet content provider and that it may be held to account for that content. Specifically, the Complaint alleges that Facebook creates and harvests user data to develop profiles for each user, categorizing them into groups based on demographics, interests, behaviors, and other criteria. Facebook then solicits demographic and other audience preferences from advertisers and implements those preferences using Facebook's proprietary algorithms to enable advertisers to include some customers and exclude others. The Complaint sufficiently alleges that, for purposes of housing advertisements, the categorizing of Facebook users based on protected characteristics, and the mechanism that Facebook offers advertisers to target those segments of the potential audience, violate the FHA. Facebook's motion should therefore be denied.[1]

---

[1] Facebook has also moved to dismiss the complaint for lack of standing, and to transfer venue. (Br. at 6-17.) The Government expresses no view on these arguments.

# BACKGROUND

On a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court is obliged to accept the

well-pleaded allegations of the Complaint as true and draw all reasonable inferences in the

plaintiff's favor. *See Selevan v. New York Thruway Authority*, 584 F.3d 82, 88 (2d Cir. 2009).

The Court should not dismiss the complaint if the plaintiff has stated "enough facts to state a

claim to relief that is plausible on its face," *Twombly v. Bell Atl. Corp.*, 550 U.S. 544, 547, 570

(2007); the plaintiff satisfies this burden by pleading facts that support a reasonable inference

that the defendant is liable for the misconduct alleged, *see Ashcroft v. Iqbal*, 556 U.S. 662, 677-

78 (2009).

A.    **Plaintiffs Allege That Facebook Classifies Its Users, Solicits Demographic and Other
      Preferences from Advertisers, and Then Implements Those Preferences by
      Including or Excluding Certain Users**

Facebook is a well-known social media platform that, among other things, permits each

user to create a personal profile to share information with others also on Facebook, including

those designated by the user as "friends," who may be family, friends, acquaintances, or people

whom the user has never met.

As Plaintiffs allege, advertising to its users is the core of Facebook's business model.

"While members join Facebook.com for free, Facebook generates its revenue through the sale of

advertising targeted at its users." *Fraley v. Facebook, Inc.*, 830 F. Supp. 2d 785, 790 (N.D. Cal.

2011). Facebook offers to advertisers "a number of different ways to engage with people on

Facebook, the most important of which is the News Feed which displays an algorithmically-

ranked series of stories and advertisements individualized for each person." (Comp. ¶ 44

(quoting Facebook, Inc. Annual Report for the Fiscal Year Ended December 31, 2017).) As a

result, Facebook users see advertisements on their "News Feeds" interspersed between or

alongside postings from their friends and other Facebook users; these users may or may not be aware that advertisements have been targeted at them. Plaintiffs allege that Facebook's "greatest advertising asset is its user base of over 2 billion people," concerning whom Facebook has collected "a remarkable amount of information," by harvesting the information that users voluntarily post on their profile pages, share with or receive from friends, or unwittingly reveal about themselves through, for example, their web browsing activity on and off Facebook and the precise location from which they log into Facebook each time. (Comp. ¶¶ 45-53.)

Plaintiffs allege that Facebook gathers, collates, and evaluates user data to categorize its users across hundreds of demographics, behaviors, and interests, which it then makes available to advertisers by creating lists of users that share certain demographics, behaviors, and interests, which Plaintiffs refer to as a "Facebook Pre-Populated List." (Comp. ¶¶ 52, 53, 55.)[2] Facebook then prompts each advertiser to define the audience to which Facebook should "target" the ad by "including" certain types of people and "excluding" others. (Comp. ¶ 54.) If an advertiser decides that it does or does not want users with certain demographics to see its advertisement, the advertiser can "include" or "exclude" the users that share that demographic by clicking a selection on a dropdown menu, or by inputting criteria into a search box. (Comp. ¶¶ 56-60.) And even before further limiting their audience through the dropdown menus, advertisers can also

---

[2] The phrase "Facebook Pre-Populated List" appears to refer to both the lists of categories on Facebook's "include" and "exclude" options, as well as the lists of users that Facebook maintains as belonging to each of those categories. To the extent that different considerations apply to each, this brief will distinguish between lists of categories, on the one hand, and lists of users, on the other, and apply the term "Facebook Pre-Populated List" to both.

exclude men or women from seeing their ads by selecting "men" or "women" on a toggle button.
As the advertiser makes these choices, a graph on the screen indicates how large or how small
the audience for the ad will be. (Comp. ¶ 61.) Using the results of its algorithms, Plaintiffs
allege, Facebook then delivers the ad only to the users that Facebook determines match the
preferences Facebook solicited from the advertiser. (Comp. ¶ 69.) Facebook charges advertisers
based on the number of users that view each ad.

      At issue in this litigation are two of Facebook's advertising functions, entitled "Boosts"
and "Ads Manager." Plaintiffs allege that these functions make use of data aggregated by
Facebook from information supplied by users on their personal profile pages, as well as
information inadvertently revealed by users such as their location or web browsing history, to
target delivery of ads to users with (or without) particular traits or interests. (Comp. ¶ 52-53.)
Plaintiffs allege that both Boosts and Ads Manager allow advertisers, including landlords,
developers, and housing service providers, to restrict which Facebook users will see their ads and
other posts based on criteria that are explicitly discriminatory and pretexts for characteristics
protected by the FHA.

      According to the Complaint, Ads Manager allows advertisers to create and place new
advertisements, then click on a box to include or exclude the Facebook Pre-Populated Lists of
desirable or undesirable customers. (Comp. ¶¶ 69-70.)  Boosts allow a Facebook user, typically a
business, to publicize an existing post on its Facebook page and have Facebook circulate the
advertisement more widely to selected users, by including or excluding audience members who
fall into the categories presented by the Facebook Pre-Populated Lists. (Comp. ¶ 64-68.) As
alleged in the Complaint, whether a landlord, developer, or housing service provider uses Boosts
or Ads Manager, Facebook invites such advertisers to construct a desired audience by including

and excluding demographic and other traits; using the results of its algorithms, Facebook then

delivers the ad only to users that Facebook determines match those preferences.[3] Facebook

provides immediate feedback to an advertiser placing an ad about the selected audience, and it

makes suggestions about the size of the ad's audience, encouraging advertisers to increase or

decrease the size.

Plaintiffs allege that these advertising capabilities generated over $40 billion in revenue

for Facebook in the year 2017. (Comp. ¶ 43.)

**B.     Facebook's Advertising Practices Become Public**

On October 28, 2016, ProPublica reported that in Ads Manager, a housing advertiser

could use Facebook's Pre-Populated Lists and exclude users Facebook determined to have an

"ethnic affinity" (later changed to "multicultural affinity"), such as "African American," "Asian

American," "Hispanic," and other demographic groupings. (Comp. ¶ 71; *see* Julia Angwin &

Terry Parris Jr., *Facebook Lets Advertisers Exclude Users by Race*, ProPublica (Oct. 28, 2016),

https://www.propublica.org/article/facebook-lets-advertisers-exclude-users-by-race.) HUD

opened an investigation into Facebook's advertising practices in November 2016. *See* Stephen

Engelberg, *HUD Has 'Serious Concerns' About Facebook's Ethnic Targeting*, ProPublica (Nov.

7, 2016), https://www.propublica.org/article/hud-has-serious-concerns-about-facebooks-ethnic-

targeting.

_____

[3] Thus, while anyone can watch Oprah, Telemundo, or the Super Bowl, or obtain a copy

of *Vogue*, *Sports Illustrated*, or *Parents* magazine (Br. 1), Facebook enables advertisers to

prevent certain users from seeing certain ads, based on how Facebook has classified those users.

After ProPublica's October 2016 article, Plaintiffs began an investigation into Facebook's practices, and Facebook promised to reform its advertising policies and tools. (Comp. ¶¶ 72-80.)

## C. Facebook Amends Its Targeting Technology in 2017

Plaintiffs allege that whatever remedial steps Facebook may have taken proved inadequate. (Comp. ¶ 81-112.) On November 21, 2017, ProPublica reported that it had bought dozens of rental housing ads on Facebook and successfully requested, through the use of Facebook Pre-Populated Lists, that Facebook exclude African-Americans, Jews, those "interested in Islam," mothers of high-school children, users interested in wheelchair ramps, expatriates from Argentina, and Spanish speakers from seeing these ads.[4] (Comp. ¶ 82; *see also* Julia Angwin, Ariana Tobin & Madeleine Varner, *Facebook (Still) Letting Housing Advertisers Exclude Users by Race*, ProPublica (Nov. 21, 2017), https://www.propublica.org/article/facebook-advertising-discrimination-housing-race-sex-national-origin. In other words, Plaintiffs allege, even after being alerted to the dangers of

---

[4] As further explained below, these categories track all seven of the prohibited bases for discrimination in housing: race, color, religion, sex, handicap, familial status, and national origin. *See* 42 U.S.C. § 3604(c).

Although the FHA uses the term "handicap" instead of "disability," the terms have the same legal meaning. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998). This brief shall use the term "disability," which is more widely accepted.

offering advertisers facially discriminatory categories with which they could target their ads, Facebook had not fixed the problem.

Plaintiffs allege, based on their testing of Facebook's advertising functions, that:

(i) Facebook eventually eliminated the ability to exclude users from seeing advertisements based on race or national origin, but only where those exclusions were explicit (Comp. ¶ 86(b));

(ii) advertisers could still make use of Facebook Pre-Populated Lists to exclude users based on familial status, particularly by excluding "parents" and "moms," and "include" potential users based on an interest in "no kids" (*id.* ¶¶ 86(c)-(d));

(iii) advertisers could exclude users from the audience for an advertisement based on sex, by including or excluding "men" or "women" (*id.* ¶¶ 86(e));

(iv) advertisers could exclude categories of people protected by the FHA by excluding interests or other categories that allegedly are pretexts for protected characteristics: for example, excluding individuals categorized as "Interest in Disabled American Veteran" instead of an explicit "disabled" exclusion (*id.* ¶¶ 86(f));

(v) Facebook created algorithms to provide "suggested" audiences to advertisers based on their prior ads, "suggestions" that discriminated on the basis of sex, familial status, disability, race, or national origin (*id.* ¶¶ 86(g).)[5]

---

[5] The recitation above is limited to the allegations of the Complaint. The Government does not suggest that the Complaint reveals all of the ways in which Facebook's advertising utilities may facilitate discriminatory advertising.

## ARGUMENT

## PLAINTIFFS HAVE STATED A CLAIM AGAINST FACEBOOK FOR VIOLATIONS OF THE FAIR HOUSING ACT

Plaintiffs allege that Facebook is liable under the FHA because it solicits preferences from housing advertisers of demographic and other audience preferences, then delivers such ads only to users who match those preferences, based on Facebook's mining of user data and the application of its proprietary algorithms. Facebook contends that it is immune from such liability under the CDA. (Br. 17-29.) Plaintiffs, however, have alleged sufficient facts that, if proven, would preclude Facebook from qualifying for CDA immunity.

### A.    The Legal Framework

#### 1.    The Fair Housing Act and Implementing Regulations

The Fair Housing Act prohibits a wide array of discrimination in housing. *See* 42 U.S.C. § 3601 ("It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States."); *see Cabrera v. Jakabovitz*, 24 F.3d 372, 388 (2d Cir. 1994) (collecting cases); *see also MHANY Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 600 (2d Cir. 2016) (concurring with *Cabrera* that the FHA reaches "a wide variety of discriminatory housing practices," but differing on burden of proof).

The Complaint alleges that Facebook's practices violate Section 3604(c) of the FHA, which makes it illegal "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, handicap, familial status, or national origin, or an intention to make any such preference, limitation, or discrimination." 42 U.S.C. § 3604(c). The Complaint also alleges that Facebook's

practices violate Sections 3604(a), (d), and (f), by making unavailable or denying a dwelling based upon prohibited characteristics. (Comp. ¶¶ 146-56.)

The implementing regulations for subsection 3604(c), promulgated pursuant to notice and comment in 1989, explain:

> (c) Discriminatory notices, statements and advertisements include, but are not limited to:
>
> . . . .
>
> (3) Selecting media or locations for advertising the sale or rental of dwellings which deny particular segments of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin.
>
> (4) Refusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin.

24 C.F.R. § 100.75. Explaining that this rule was not intended to prevent newspapers from running advertisements based on purely geographical considerations, HUD noted that the rule was intended to prevent targeting:

> the Department believes that a Title VIII [FHA] violation occurs whenever the advertiser determines the manner for advertising because of the race, color, religion, sex or national origin of persons who receive or do not receive a publication . . . .

45 Fed. Reg. 57,104 (Aug. 26, 1980).[6] Accordingly, unlawful discrimination can occur through the choice of who receives an ad, regardless of whether the content of the ad itself is facially discriminatory.

The Second Circuit has repeatedly held that the standard for establishing a violation of 42 U.S.C. § 3604(c) is whether an "ordinary reader" would conclude that the advertiser is

---

[6] Disability and familial status were added to Section 3604(c) in 1989.

expressing a discriminatory preference or other distinction based on a protected characteristic. *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 41 (2d Cir. 2015) (quoting *Ragin v. Harry Macklowe Real Estate Co.*, 6 F.3d 898, 905 (2d Cir. 1993) ("*Ragin II*") (quoting *Ragin v. N.Y. Times Co. ("Ragin I")*, 923 F.2d 995, 999 (2d Cir. 1991))). Thus, "the statute prohibits all ads that indicate a [discriminatory] preference to an ordinary reader whatever the advertiser's intent." *Ragin I*, 923 F.2d at 999. Accordingly, "[n]either the text of the statute nor its legislative history suggests that Congress intended to exempt from its proscriptions subtle methods of indicating [discriminatory] preferences." *Id.* at 1000.

Similarly, publishing a targeted advertisement can violate Section 3604(c) if the targeting is based upon a characteristic the FHA protects. Section 3604(c) applies broadly to anyone who "cause[s]" a discriminatory statement or advertisement to be "made, printed, or published." 42 U.S.C. § 3604(c); s*ee, e.g.*, *Ragin I*, 923 F.2d at 1004 (rejecting "the model of the obtuse publisher"); *United States v. Hunter*, 459 F.2d 205, 211 (4th Cir. 1972) ("the congressional prohibition of discriminatory advertisements was intended to apply to newspapers as well as any other publishing medium"). In *United States v. Space Hunters, Inc.*, 429 F.3d 416 (2d Cir. 2005), for example, the Second Circuit held that a "housing information vendor" who "compiles information" about housing opportunities, "communicates with owners or landlords of rooms for rent, and refers prospective tenants" was liable under Section 3604(c). *See id.* at 419. The court reasoned that Section 3604(c)'s proscription of "*any* notice, statement, or advertisement" applied on its face to anyone who made prohibited statements, including an intermediary between housing providers and prospective tenants. *See id.* at 424.

To define the audience for an ad, and to publish an ad only to that audience, can "cause" a discriminatory statement or advertisement to be both "made" and "published." The authorities

upon which Facebook relies (Br. 29) affirm the potential viability of ad targeting claims. *See Martinez v. Optimus Props., LLC*, Case Nos. 2:16–cv–08598–SVW–MRW, 2017 WL 1040743, at *5 (C.D. Cal. Mar. 14, 2017) ("Plaintiffs allege that Defendants selectively advertised to particular segments of the housing market while denying information to people with disabilities, Latinos, and families with children. Their discriminatory advertising theory is viable."); *Guevara v. UMH Props., Inc.*, No. 2:11–cv–2339–SHL–tmp, 2014 WL 5488918, at *6 (W.D. Tenn. Oct. 29, 2014) ("Plaintiffs' allegation that Defendant only advertised in Spanish language media outlets is sufficient to state a claim . . . .").

Furthermore, Plaintiffs state a claim under Section 3604(d), which makes it unlawful "[t]o represent to any person because of race, color, religion, sex, handicap, familial status, or national origin that any dwelling is not available for inspection, sale, or rental when such dwelling is in fact so available." (*See* Comp. ¶ 148.c.)  The implementing regulation explains that unlawful actions include "[*l*]*imiting information*, by word or conduct, regarding suitably priced dwellings available for inspection, sale or rental, because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.80(b)(4) (emphasis added).  Facebook mentions Plaintiffs' Section 3604(d) claim purely in passing (Br. 25), and offers no explanation why this claim should be dismissed.

Finally, Sections 3604(a) and (f) prohibit conduct that "otherwise makes unavailable" fair housing opportunity; excluding certain demographics from even seeing an ad for a housing opportunity, as Plaintiffs allege here, plainly "makes" it "unavailable." Thus, Facebook's objection that it neither sells nor rents any dwelling is irrelevant. Facebook relies on a very slender reed in *Housing Opportunities Made Equal v. Cincinnati Enquirer, Inc.*, 731 F. Supp. 801 (S.D. Ohio 1990), *aff'd*, 943 F.2d 644 (6th Cir. 1991), to suggest that neither

Section 3604(a) or (f) "apply to claims based on advertising." (Br. 26). In that case, the court

noted that because neither party briefed the issue, and plaintiff failed to even argue that

Section 3604(a) applied, that claim "appears to be without any basis." 731 F. Supp. at 803 n.1.

The facts alleged here, by contrast, support liability under Sections 3604(a) and (f) because

Facebook actively facilitates advertisements that make housing unavailable to certain protected

classes.

### 2.        The Communications Decency Act

The CDA was enacted to preserve the ability of the Internet to offer "a forum for a true

diversity of political discourse, unique opportunities for cultural development, and myriad

avenues for intellectual activity." 47 U.S.C. § 230(a). To protect these benefits, without allowing

the Internet to become a tool for lawlessness, Congress imposed limitations upon the liability of

website owners and operators. The CDA accordingly immunizes "interactive computer service"

providers against liability arising from content created by third parties: "No provider . . . of an

interactive computer service shall be treated as the publisher or speaker of any information

provided by another information content provider." 47 U.S.C. § 230(c). On the other hand, the

CDA does not immunize "information content provider[s]," defined as website operators that are

"responsible, in whole or in part, for the creation or development of" content. *Id.* § 230(f)(3).

The CDA resolved the problem of court decisions that had previously held websites

liable for any and all material that third-party users published on their platforms, to the extent

that the website conducted any sort of editorial review of the postings. *See, e.g.*, *Fair Housing

Council v. Roommates.com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2007) (en banc). The CDA

imposes liability only where the website itself has at least in part "developed" or "created"

content, as opposed to merely hosting it. *See Roommates.com*, 521 F.3d at 1163; *see also Ricci v.*

*Teamsters Union Local 456*, 781 F.3d 25, 27-28 (2d Cir. 2015) (declining to hold website liable
as a "publisher or speaker" of allegedly defamatory statements authored entirely by someone
else). The question posed by Facebook's motion, therefore, is whether Plaintiffs have sufficiently
pleaded that, as to Boosts and Ads Manager, Facebook in part "developed" the content at issue
and is therefore an information content provider.

### 3. Websites Are Not Entitled to Immunity Under the Communications Decency Act When They Act As "Content Providers"

Two leading cases frame the analysis of the application of CDA immunity to FHA
claims. In *Chicago Lawyers' Comm. for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519
F.3d 666 (7th Cir. 2008), the Seventh Circuit concluded that Craigslist.com was immune from
FHA liability based on the CDA because it performed only the functions of an interactive
computer service. Craigslist.com permitted anyone to post an ad for anything, and the owners
and operators of Craigslist.com engaged in *no* efforts to categorize or classify its users, or to
review or promote the postings, and provided unlimited access to material on the site. *See id.* at
668-69. In this way, Craigslist.com did not even partially "develop" or "create" the content at
issue.

By contrast, in *Roommates.com*, the Ninth Circuit concluded that Roommate.com, the
website operator, was not immune from FHA liability based on the CDA to the extent it was an
information content provider. Roommate.com operated roommates.com, a website that matched
people renting out spare rooms with those looking for a place to live. Anyone wishing to post on
the website was required to state, inter alia, the sex and familial status of the desired tenant.
Roommate.com then used these preferences to determine which postings were shown to which
users of the website based on each user's selections through use of drop down menus and pre-
populated lists, similar to the tools provided by Facebook. *See id.* at 1161-62. The Ninth Circuit

14

subsequently clarified that the FHA's protections did not apply to individuals advertising to share a dwelling (an "independent living unit") with another person. *See Fair Housing Council v. Roommate.com*, 666 F.3d 1216, 1220 (9th Cir. 2012) ("There is no evidence that Congress intended to interfere with personal relationships *inside* the home. Congress wanted to address the problem of landlords discriminating in the sale and rental of housing, which deprived protected classes of housing opportunities."). While Plaintiffs' allegations would not therefore state a claim against individuals seeking a roommate to share a dwelling, these allegations state a claim against landlords, developers, and housing service providers.

Notably, the Ninth Circuit found Roommate.com was not entitled to CDA immunity to the extent that it elicited information about protected characteristics and then used that information to determine whether other users would be allowed to see, or prevented from seeing, those postings based on advertiser preferences. *Roommates.com* explained that an entity is responsible for the "development" of content "in whole or in part" if the entity "contributes materially to the alleged illegality of the content." 521 F.3d at 1168; *see also Fed. Trade Com'n v. LeadClick Media, LLC*, 838 F.3d 158, 174 (2d Cir. 2016) (citing *Roommates.com*; defendant may be liable under the CDA by "not merely . . . augmenting the content generally, but . . . materially contributing to its alleged unlawfulness"). The court ruled that the CDA did not shield the company from liability for eliciting information about these protected characteristics, and the discriminatory responses generated by this information, because the company materially contributed to the development of that content. *See Roommates.com*, 521 F.3d at 1165-72.

The court noted, however, that Roommate.com featured an "Additional Comments" section, where housing providers and seekers could write whatever additional information they wanted to include about their tenant preferences, and Roommate.com exercised no editorial

15

control over those comments. As to these "Additional Comments," the court found that

Roommate.com was entitled to CDA immunity, because it played no role in developing any of

that content, and merely provided a "neutral tool" through which users could express themselves

if they so chose. 521 F.3d at 1174-75.

A single website could therefore be an interactive computer service in some respects, and

thus entitled to CDA immunity, but an information content provider in others, and thus not

immune:

> A website operator can be both a service provider and a content provider: If it
> passively displays content that is created entirely by third parties, then it is only a
> service provider with respect to that content. But as to content that it creates itself,
> or is "responsible, in whole or in part" for creating or developing, the website is
> also a content provider. Thus, a website may be immune from liability for some of
> the content it displays to the public but be subject to liability for other content.

*Roommates.com*, 521 F.3d at 1162-63; *see also LeadClick*, 838 F.3d at 173. Accordingly,

Facebook paints with too broad a brush in asserting that "courts repeatedly have held that the

CDA protects Facebook from claims arising from it[s] publication of content created by third

parties" (Br. 18); these cases must be read in the context of the particular Facebook function and

content at issue in each case. In *Klayman v. Zuckerberg*, 753 F.3d 1354 (D.C. Cir. 2014), for

example, a lawyer objected to an anti-Semitic page created by a Facebook user and demanded

that it be removed. *See id.* at 1356-57. The court held that, in the context of a Facebook page that

Facebook merely hosted, and played no role in developing or curating, "Facebook qualifies as an

interactive computer service," and CDA immunity applied. *See id.* at 1357-58. Similarly, in both

*Cohen v. Facebook*, 252 F. Supp. 3d 140 (E.D.N.Y. 2017), and *Force v. Facebook*, 16-CV-5158

(NGG) (LB), 2018 WL 472807 (E.D.N.Y. Jan. 17, 2018), the court rejected efforts to hold

Facebook liable merely for allowing terrorist organizations to use the site. *See also Cross v.*

*Facebook, Inc.*, 14 Cal. App. 5th 190, 207 (1st Dist. 2017) (finding Facebook immune under

16

CDA for hosting webpage critical of musician). In none of these cases did the court consider whether Facebook developed, in whole or in part, content through its advertising functions, let alone its advertising targeting functions, thereby making it a "content provider."

Thus, it is misleading to argue that "[i]t is beyond dispute that Facebook is a provider of an interactive computer service" (Br. 19); while that may be true for some uses, this case concerns very different uses. *See, e.g.*, *Fraley*, 830 F. Supp. 2d at 801-02 (finding Facebook was information content provider not immune under CDA for "Sponsored Stories" advertising). By the same token, this Court's decision in this case to treat Facebook as a content provider with respect to Boosts and Ads Manager would not mean that Facebook would then become a content provider in all (or any) other respects.

## B.    Plaintiffs Have Sufficiently Alleged that Facebook Is a "Content Provider" Not Entitled to Immunity Under the CDA

Based upon the allegations of the Complaint, Facebook's Boosts and Ad Manager utilities are plainly more similar to the functions that did not confer immunity in *Roommates.com* than those functions that did confer immunity in *Roommates.com* and *Craigslist*.

### 1.    Plaintiffs' Allegation That Facebook Mines User Data to Create Categories for Advertisers to Target or Exclude

Facebook is not entitled to CDA immunity at the motion to dismiss stage because, according to the Complaint, Facebook mines user data, some of which users must provide, and then actively classifies users based on that data. As the Complaint alleges, Facebook has created content when it mines user data to "create" and "customize" an audience for a particular advertiser:

- •      Facebook has created "a pre-populated list of demographics, behaviors, and interests from which housing providers select in order to exclude certain home seekers from ever seeing their ads." (Comp. ¶ 2.)

17

- "Facebook's ability to customize an online audience for advertisements based on its vast trove of user data has made it the biggest advertising agency in the world — the advertising platform of choice for millions of businesses." (Comp. ¶ 3.)

Thus, Facebook allegedly seizes upon benign content posted by its users — not merely sex and location but also personal interests, demographic information, and browsing history — to actively classify its users into categories that, according to Plaintiffs, enable landlords, developers, and housing service providers to discriminate more efficiently. Facebook markets the availability, ease of use, and effect of these classifications to potential advertisers without regard to the possible illegality of these classifications under federal fair housing laws. Moreover, Facebook specifically markets its ad targeting platform as a useful tool for providers of housing-related services covered by the FHA. *See* "Success Story: Property ads that run themselves," available at www.facebook.com/business/success/zephyr-real-estate (visited June 13, 2018) (real estate agency); "Success Story: Reaching prospective borrowers," available at www.facebook.com/business/success/sofi (visited June 13, 2018) (mortgage finance company).

The Complaint further alleges that users must permit Facebook to view, collect, and mine their personal data as a condition of using the service. Comp. ¶ 48; *see also Roommates.com*, 521 F.3d at 1166 ("When a business enterprise extracts such information from potential customers as a condition of accepting them as clients, it is no stretch to say that the enterprise is responsible, at least in part, for developing that information."). Like Roommate.com, Plaintiffs allege, Facebook "forces users to . . . provide information that other clients can use to discriminate unlawfully." *Id.* at 1166 n.19. Although users can prevent Facebook from targeting ads to them based on certain sources of information, such as web browsing history, users cannot opt out of ads targeted at them based on other sources of information, such as the sex they list on their profile. "By requiring subscribers to provide the information as a condition of accessing its services,"

18

Facebook "becomes much more than a passive transmitter of information provided by others; it becomes the developer, at least in part, of that information" and can therefore be held liable as a developer of that content notwithstanding the CDA. *Id.* at 1165-66; *see also Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 701 (S.D.N.Y. 2009) ("Thus, key to the Ninth Circuit's decision was the fact that Roommate.com was actively participating in creating the objectionable content, by providing the questions and by requiring users to answer them.").

As Plaintiffs allege, Facebook requires users to provide their sex (as well as their name and age) when signing up for the service. *See Fraley*, 830 F. Supp. 2d at 791. And, Plaintiffs allege, users cannot opt out of providing certain data to Facebook about the precise location (and from what device and browser) they log in from each time they view or use Facebook. Users cannot opt out of whatever conclusions Facebook draws from the pages they visit, the posts they "like," the ads they click on, and other such activities on or off Facebook; in other words, Facebook users may or may not know, and for certain characteristics they have no way of finding out, that Facebook has labeled them as having an interest in "Disabled Parking Permit" (Comp. ¶ 87), or "English as a Second Language" (Comp. ¶ 88), or "moms of preschool kids" (Comp. ¶ 91), and thereby, through the use of Facebook's advertising tools, marked them as potentially undesirable customers for housing and housing-related services. "Section 230(c) immunity is not so broad as to extend to an interactive computer service that goes beyond the traditional publisher's role and takes an active role in creating or developing the content at issue." *MCW, Inc. v. Badbusinessbureau.com, L.L.C.*, No. CIV.A.3:02-CV-2727-G, 2004 WL 833595, at *8 (N.D. Tex. Apr. 19, 2004). Facebook's involuntary and highly specific characterization and classification of users according to protected characteristics renders Facebook a content developer under the CDA as to its Boosts and Ad Manager functions.

By allegedly collecting user data, collating user data, and classifying its users based in part upon protected characteristics, Facebook participates in the "mak[ing]," of an "advertisement" "that indicates any preference, limitation, or discrimination." 42 U.S.C. § 3604(c). For example, Plaintiffs allege that Facebook can implement the advertiser preferences that it solicits in the following ways, all of which would state a claim under the FHA:

- exclude users that Facebook required to identify themselves as "women" or whom Facebook identifies as "moms," thereby discriminating on the basis of sex and familial status (Comp. ¶ 91);

- exclude users that Facebook identifies as interested in "Disabled Parking Permit" or "Disability.gov," an alleged pretext to discrimination on the basis of disability (Comp. ¶ 87);

- exclude users that Facebook identifies as interested in "Univision" and "Telemundo" (two Spanish-language television stations), an alleged pretext to discrimination on the basis of national origin (Comp. ¶ 88).

Rejecting Facebook's argument that it was merely an "interactive computer service," the court in *Fraley*, 830 F. Supp. 2d 785, denied Facebook's motion to dismiss a suit alleging unlawful misappropriation based on another of its advertising utilities, "Sponsored Stories," which generally appeared as a friend's recommendation of a product or service. *See id.* at 790-92. Plaintiffs in *Fraley* objected to these "Sponsored Stories" on the ground that Facebook was falsely suggesting that a specific user endorsed a service or product merely because he or she clicked on an ad, thereby "drafting millions of [Facebook members] as unpaid and unknowing spokespersons for various products." *Id.* at 792. Although Facebook argued in *Fraley*, as it does here, that it was merely an "interactive computer service," the court disagreed, noting that the complaint alleged, as it does here, that Facebook "creat[ed] and develop[ed] commercial content," and that Facebook "group[ed] such content in a particular way," *id.* at 801, as Plaintiffs

20

allege here with regard to the use and creation of Facebook Pre-Populated Lists for Boosts and Ads Manager.

Similarly, the court in *Perkins v. LinkedIn Corp.*, 53 F. Supp. 3d 1222 (N.D. Cal. 2014), found that LinkedIn.com, a job and networking website, was not immune from liability, because LinkedIn.com's practice of "harvesting" the email addresses of potential users from current users' contact lists and email history, then generating reminder invitations to join LinkedIn.com, constituted content development. *See id.* at 1225, 1247-48; *see also Fed. Trade Com'n v. Accusearch Inc.*, 570 F.3d 1187, 1199-1200 (10th Cir. 2009) (website that sold telephone records and other personal data was "information content provider" because it "specifically encourages development of what is offensive about the content," or "affirmatively solicit[s]," others to create the prohibited content). The Complaint's allegations that Facebook created "Facebook Pre-Populated Lists" by creating and placing users into categories created by mining user data is similar to the "harvesting" in *Roommates.com*, *Fraley*, *Perkins*, and *Accusearch*. Facebook's motion should therefore be denied.

### 2. Plaintiffs' Allegation That Facebook Invites Advertisers to Target Certain Users Based on Unlawful Criteria

A second basis to deny Facebook CDA immunity is that Facebook's ad utilities, as alleged in the Complaint, invite housing providers to express unlawful demographic and other audience preferences. According to the Complaint, Facebook prompts advertisers to select — through dropdown menus, prepopulated lists, and other tools — explicitly protected traits, such as sex, and alleged pretexts for protected traits. In this way, Facebook goes beyond providing a blank slate for advertisers. Instead, Facebook's advertising platform suggests unlawful options, including to landlords, developers, and housing service providers, as part of "mak[ing]" an

"advertisement . . . that indicates any preference, limitation, or discrimination" based on
protected characteristics. 42 U.S.C. § 3604(c).

As the court in *Roommates.com* explained, "[u]nlawful questions solicit (a.k.a. 'develop')
unlawful answers." 521 F.3d at 1166. Contrary to Facebook's contention (Br. 21-22),
Facebook's dropdown menus and other tools, as alleged, differ dramatically from Grindr's
dropdown menus, which one court found entitled to CDA immunity. *See Herrick v. Grindr, LLC*,
306 F. Supp. 3d 579 (S.D.N.Y. 2018). The selections, such as "'preferred sexual position'
constitute quintessential 'neutral assistance'" because they "are not intrinsically offensive or
unlawful." *Id.* at 589. Grindr did not ask its users to select from a dropdown menu whether they
would like to harass, stalk, or impersonate someone, the unlawful activities for which the
plaintiff in *Herrick* sought to hold Grindr accountable. By contrast, as the *Herrick* court itself
recognized, "'[t]he act of hiding certain listings [is] itself unlawful under the Fair Housing Act.'"
*Id.* (quoting *Roommates.com*, 521 F.3d at 1169); *see also* 42 U.S.C. § 3604(d). Unlike Grindr's
dropdown menus, Facebook's dropdown menus and other tools ask unlawful questions, and offer
housing advertisers options that are inherently unlawful, to preclude users from seeing housing
ads based on protected characteristics.

Facebook's claim that it is immune because the advertiser, and not Facebook, decides
which categories of users to include or exclude from advertisements is specious: "The CDA does
not grant immunity for inducing third parties to express illegal preferences." *Roommates.com*,
521 F.3d at 1165. Accordingly, Facebook and the advertiser are co-developers of each targeted
ad because "the fact that [advertisers] are information content providers does not preclude
[Facebook] from also being an information content provider by helping 'develop' at least 'in
part' the [unlawful content]." *Id.* To hold otherwise and consider Facebook responsible "only

[for] content that originates entirely with the website . . . ignores the words 'development . . . in part' in the statutory passage." *Id.* at 1167. In addition, the dropdown menus and other tools are themselves content (in that they are material existing on the internet); unlike the advertisements, Facebook alone developed, and is therefore responsible for, the composition of these tools. Facebook's "own acts — posting the questionnaire and requiring answers to it — are entirely its doing and thus section 230 of the CDA does not apply to [those acts]." *Id.* at 1165. In sum, Facebook's "work in developing the discriminatory questions, discriminatory answers and discriminatory search mechanisms," as alleged in the Complaint, precludes it from CDA immunity for its advertising tools and for the unlawfully targeted ads placed using those tools. *Id.* at 1172.

### 3. Plaintiffs' Allegation That Facebook Uses Its Algorithms to Deliver Discriminatorily Targeted Ads

After an ad is placed, Facebook is responsible for delivering the ad only to certain users, and thereby "publish[es]" an "advertisement . . . that indicates any preference, limitation, or discrimination" based on protected characteristics, 42 U.S.C. § 3604(c), and "represent[s] . . . that any dwelling is not available . . . when such dwelling is in fact so available," *id.* § 3604(d). Facebook can be held liable for delivering the ads because, as Plaintiffs allege, Facebook "filters listings . . . [and] directs [ads] to subscribers according to discriminatory criteria." *Roommates.com*, 521 F.3d at 1167. Thus, Facebook is not entitled to CDA immunity because its "connection to the discriminatory filtering process is direct and palpable. [It] designed its . . . systems to limit the listings available to subscribers based on [protected characteristics]." *Id.* at 1169.

In this way, Plaintiffs' allegations bear a striking resemblance to those that withstood the CDA in *Roommates.com*. The court in *Roommates.com* denied CDA immunity when

"subscribers with children [would] not be notified of new listings where the owner specifies 'no children.'" *Id.* This scenario is indistinguishable from Plaintiffs' allegation that by using Facebook's ad targeting tools, an advertiser can exclude families with young children from an ad's potential audience. (Comp. ¶¶ 97-102.)

Facebook's analogy to "newspapers [that] sell advertising space to sporting goods stores in the sports section" (Br. 24-25) is inapt; anyone can pick up the sports section and see those advertisements, and there is no federal law mandating equality of sporting goods opportunity. The Complaint alleges that Facebook "both elicits the allegedly illegal conduct and makes aggressive use of it in conducting its business," *Roommates.com*, 521 F.2d at 1172, by actively marketing its ad targeting platform as a selling point to its customers, then publishing ads knowing that they will be delivered precisely to some audiences and not others, including based on criteria that the FHA makes illegal. That Facebook allegedly charged its advertisers $40 billion in 2017 for curating lists of users based on demographics, behaviors, and interests, and then delivering ads to groups of users defined by those features (Comp. ¶ 43), suggests that Facebook believes that its involvement in the making and publication of these ads is substantial.

**CONCLUSION**

Because the CDA does not shield Facebook from FHA liability, the Court should deny

Facebook's motion to dismiss the FHA claims.


Dated:      New York, New York
            August 17, 2018

                                        GEOFFREY S. BERMAN
                                        United States Attorney for the
                                        Southern District of New York
                                        Attorney for the United States

                            By:         _____
                                        ELLEN BLAIN
                                        DAVID J. KENNEDY
                                        JACOB LILLYWHITE
                                        CHRISTINE POSCABLO
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, New York 10007
                                        Tel.: (212) 637-2733
                                        Fax: (212) 637-0033
                                        david.kennedy2@usdoj.gov

J. PAUL COMPTON, JR.
    General Counsel
DAVID WOLL, JR.
    Deputy General Counsel
    for Enforcement & Fair Housing
AYELET WEISS
    Trial Attorney
United States Department of
Housing & Urban Development
451 Seventh St., SW
Washington, DC 20410

**CERTIFICATE OF COMPLIANCE**

Pursuant to this Court's Individual Rules of Practice, the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of this Court's Rules. As measured by the word processing system used to prepare this brief, there are 6,990 words in the body of this brief.

Dated:       New York, New York
              August 17, 2018

DAVID J. KENNEDY
Assistant United States Attorney
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2733
Fax: (212) 637-0033
david.kennedy2@usdoj.gov