# Exhibit 2

UNITED STATES OF AMERICA
DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT
OFFICE OF ADMINISTRATIVE LAW JUDGES

_____
The Secretary, United States                          )
Department of Housing and Urban                       )
Development, on behalf of Complainant                 )
Assistant Secretary for Fair Housing and Equal        )
Opportunity,                                          )
                                                      )     HUD ALJ No.
         Charging Party,                             )     FHEO No.  01-18-0323-8
                                                      )
         v.                                          )
                                                      )
Facebook, Inc.,                                       )
                                                      )
         Respondent                                  )
_____)

**CHARGE OF DISCRIMINATION**

**I.     JURISDICTION**

On August 13, 2018, the Assistant Secretary for Fair Housing and Equal Opportunity ("Assistant Secretary") filed a timely complaint with the Department of Housing and Urban Development ("HUD" or the "Department") alleging that Respondent violated subsections 804(a), 804(b), 804(c) and 804(f) of the Fair Housing Act, 42 U.S.C. §§ 3601-19 ("Act"), by discriminating because of race, color, religion, sex, familial status, national origin and disability.

The Act authorizes the Secretary of HUD to issue a Charge of Discrimination ("Charge") on behalf of aggrieved persons following an investigation and a determination that reasonable cause exists to believe that a discriminatory housing practice has occurred.  *See* 42 U.S.C. § 3610(g)(1), (2).  The Secretary has delegated that authority to the General Counsel, 24 C.F.R. §§ 103.400, 103.405, who has re-delegated that authority to the Associate General Counsel for Fair Housing and the Assistant General Counsel for Fair Housing Enforcement.  76 Fed. Reg. 42,463, 42,465 (July 18, 2011).

By a Determination of Reasonable Cause issued contemporaneously with this Charge of Discrimination, the Director of the Office of Systemic Investigations in the Office of Fair Housing and Equal Opportunity has determined that reasonable cause exists to believe that a discriminatory housing practice has occurred and has authorized and directed the issuance of this Charge.  42 U.S.C. § 3610(g)(2).

## II. SUMMARY OF FINDINGS IN SUPPORT OF THIS CHARGE

Based on HUD's investigation of the allegations contained in the aforementioned complaint and the Determination of Reasonable Cause, Respondent is hereby charged with violating the Act as follows:

### A. Legal Authority

1. It is unlawful to make unavailable or deny a dwelling to any person because of race, color, religion, sex, familial status, national origin or disability. 42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

2. It is unlawful to discriminate against any person in the terms, conditions, or privileges of the sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, national origin or disability. 42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

3. It is unlawful to make, print, or publish, or cause to be made, printed, or published, any notice, statement, or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on race, color, religion, sex, familial status, national origin or disability, or that indicates an intention to make such a distinction. 42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1). Such unlawful activity includes "[s]electing media or locations for advertising the sale or rental of dwellings which deny a particular segment of the housing market information about housing opportunities because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.75(c)(3). Such unlawful activity also includes "[r]efusing to publish advertising for the sale or rental of dwellings or requiring different charges or terms for such advertising because of race, color, religion, sex, handicap, familial status, or national origin." 24 C.F.R. § 100.75(c)(4).

### B. Parties

4. Complainant Assistant Secretary is authorized to file a complaint of discrimination under the Act on behalf of the Secretary of HUD. 42 U.S.C. § 3610(a); 24 C.F.R. § 103.204(a).

5. Respondent Facebook, Inc., is incorporated in Delaware with headquarters in Menlo Park, California. Respondent is the second largest online advertiser in the United States and is responsible for approximately twenty percent of all online advertising nationwide.

6. Respondent operates Facebook and Instagram, two of the most widely used social media platforms in the United States. Facebook has approximately 221 million active users in the United States and over two billion active users globally, while Instagram has approximately 114 million active users in the United States and over one billion active users globally, with active user defined as someone who uses the platform at least once per month. Respondent also operates Messenger, a messaging tool and platform that can be accessed from within Facebook

or through a standalone website and mobile application. In addition, Respondent has created an "Audience Network," which is comprised of thousands of websites and mobile applications that are operated by third parties but on which Respondent displays targeted ads.

### C. Factual Allegations

7. Respondent collects millions of data points about its users, draws inferences about each user based on this data, and then charges advertisers for the ability to microtarget ads to users based on Respondent's inferences about them. These ads are then shown to users across the web and in mobile applications. Respondent promotes and distinguishes its advertising platform by proclaiming that "most online advertising tools have limited targeting options . . . like location, age, gender, interests and potentially a few others. . . . But Facebook is different. People on Facebook share their true identities, interests, life events and more."[1] As Respondent explains, its advertising platform enables advertisers to "[r]each people based on . . . zipcode . . . age and gender . . . specific languages . . . the interests they've shared, their activities, the Pages they've like[d] . . . [their] purchase behaviors or intents, device usage and more."[2] Thus, Respondent "use[s] location-related information-such as your current location, where you live, the places you like to go, and the businesses and people you're near to provide, personalize and improve our Products, including ads, for you and others."[3]

8. Advertisers pay Respondent to show targeted ads to users on Facebook, Instagram, and Messenger, and on Respondent's Audience Network. Targeted ads are generally placed through a single advertising platform called Ads Manager regardless of where the ads will be shown to users.

9. Respondent holds out its advertising platform as a powerful resource for advertisers in many industries, including housing and housing-related services. For example, Respondent promotes its advertising platform with "success stories," including stories from a housing developer, a real estate agency, a mortgage lender, a real-estate-focused marketing agency, and a search tool for rental housing.

10. Respondent's advertising platform is actively being used for housing-related ads. Such ads include ads for mortgages from large national lenders, ads for rental housing from large real estate listing services, and ads for specific houses for sale from real estate agents.

11. Because of the way Respondent designed its advertising platform, ads for housing and housing-related services are shown to large audiences that are severely biased based on characteristics protected by the Act, such as audiences of tens of thousands of users that are nearly all men or nearly all women.

---

[1] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited Mar. 27, 2019).

[2] Facebook Business, *Your Guide to Digital Advertising*, www.facebook.com/business/help/1029863103720320?helpref=uf_permalink (visited Mar. 27, 2019).

[3] Facebook, *Data Policy* (Apr. 19, 2018), www.facebook.com/privacy/explanation/.

12.     Respondent sells advertisers the ability to target advertisements to people who, according to Respondent's assessment of the data it collects, share certain personal attributes and/or are likely to respond to a particular ad.  Users may disclose some data about themselves when they set up their profiles, such as name and gender.  However, users disclose most of this data unwittingly through the actions they, and those associated with them, take on and off of Respondent's platforms.

13.     Respondent determines which users will see an ad through a two-phase process.  First, in the ad targeting phase, Respondent provides the advertiser with a variety of tools for selecting an ad's "eligible audience."  In other words, the advertiser can specify attributes that the users who will be shown the ad must have and attributes that users who will be shown the ad must not have.  Second, in the ad delivery phase, Respondent selects the ad's "actual audience," meaning Respondent chooses which users will actually be shown the ad from among the pool of eligible users.

14.     During the ad targeting phase, Respondent provides an advertiser with tools to define which users, or which types of users, the advertiser would like to see an ad.  Respondent has provided a toggle button that enables advertisers to exclude men or women from seeing an ad, a search-box to exclude people who do not speak a specific language from seeing an ad, and a map tool to exclude people who live in a specified area from seeing an ad by drawing a red line around that area.  Respondent also provides drop-down menus and search boxes to exclude or include (i.e., limit the audience of an ad exclusively to) people who share specified attributes.  Respondent has offered advertisers hundreds of thousands of attributes from which to choose, for example to exclude "women in the workforce," "moms of grade school kids," "foreigners," "Puerto Rico Islanders," or people interested in "parenting," "accessibility," "service animal," "Hijab Fashion," or "Hispanic Culture."  Respondent also has offered advertisers the ability to limit the audience of an ad by selecting to include only those classified as, for example, "Christian" or "Childfree."

15.     During this first phase, Respondent also provides a tool called Custom Audiences, which enables an advertiser to use a list of specific people whom the advertiser wants included in or excluded from the eligible audience for an ad.  The advertiser can do this by uploading the personal information of its customers, or by having Respondent generate a list of people who have engaged with the advertiser's content on Facebook or Instagram, on other websites, in a mobile application, or offline.

16.     Facebook offers a variant of its Custom Audiences tool called Lookalike Audiences.  If an advertiser selects this option, the platform directs the advertiser to pick a Custom Audience that represents the advertiser's "best existing customers."  Respondent then identifies users who share "common qualities" with those customers, and these users become the ad's eligible audience.  To generate a Lookalike Audience, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone, not the advertiser, determines which users will be included in a Lookalike Audience.

4

17.     During the second phase, the ad delivery phase, Respondent selects from among the users eligible to see an ad which users will actually see it.  Respondent bases this decision in large part on the inferences and predictions it draws about each user's likelihood to respond to an ad based on the data it has about that user, the data it has about other users whom it considers to resemble that user, and the data it has about "friends" and other associates of that user.  To decide which users will see an ad, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone, not the advertiser, determines which users will constitute the "actual audience" for each ad.

18.     Respondent charges advertisers different prices to show the same ad to different users.  The price to show an ad to a given user is based, in large part, on how likely Respondent believes that user is to interact with the particular ad.  To decide how an ad will be priced for each user, Respondent considers sex and close proxies for the other protected classes.  Such proxies can include which pages a user visits, which apps a user has, where a user goes during the day, and the purchases a user makes on and offline.  Respondent alone sets the price the advertiser will pay to have Respondent show each ad to each user.  Furthermore, Respondent uses the pricing differentials it sets to determine which users will see which ads rather than allowing advertisers to make that decision.  As Respondent explains, "If there are more and cheaper opportunities among men than women, then we'd automatically spend more of [an advertiser's] overall budget on the men."[4]

19.     Respondent's ad delivery system prevents advertisers who want to reach a broad audience of users from doing so.  Even if an advertiser tries to target an audience that broadly spans protected class groups, Respondent's ad delivery system will not show the ad to a diverse audience if the system considers users with particular characteristics most likely to engage with the ad.  If the advertiser tries to avoid this problem by specifically targeting an unrepresented group, the ad delivery system will still not deliver the ad to those users, and it may not deliver the ad at all.  This is so because Respondent structured its ad delivery system such that it generally will not deliver an ad to users whom the system determines are unlikely to engage with the ad, even if the advertiser explicitly wants to reach those users regardless.

20.     To group users by shared attributes, to create a Lookalike Audience, to determine an ad's "actual audience" during the ad delivery phase, and to price each ad for each user, Respondent combines the data it has about user attributes and behavior on its platforms with data it obtains about user behavior on other websites and in the non-digital world.  Respondent then uses machine learning and other prediction techniques to classify and group users so as to project each user's likely response to a given ad.  In doing so, Respondent inevitably recreates groupings defined by their protected class.  For example, the top Facebook pages users "like" vary sharply by their protected class, according to Respondent's "Audience Insights" tool.  Therefore, by grouping users who "like" similar pages (unrelated to housing) and presuming a shared interest

---

[4] Facebook, *Why did my cost per result go up when I increased my budget*, [https://web.archive.org/web/20160930124257/https://www.facebook.com/business/help/934288416682198?helpref=faq_content] (archived on Sep. 30, 2016 by The Internet Archive).

5

or disinterest in housing-related advertisements, Respondent's mechanisms function just like an advertiser who intentionally targets or excludes users based on their protected class.

### D. Legal Allegations

21. As described above, Respondent discriminated by making dwellings unavailable because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(a), (f)(1); 24 C.F.R. § 100.50(b)(1), (3); 24 C.F.R. § 100.60(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(a).

22. As described above, Respondent discriminated in the terms, conditions, or privileges of the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability.  42 U.S.C. § 3604(b), (f)(2); 24 C.F.R. § 100.50(b)(2); 24 C.F.R. § 100.65(a); 24 C.F.R. § 100.70(b); 24 C.F.R. § 100.202(b).

23. As described above, Respondent made, printed, or published – or caused to be made, printed, or published – notices, statements, or advertisements with respect to the sale or rental of dwellings that indicated preferences, limitations, or discrimination because of race, color, religion, sex, familial status, national origin or disability, or that indicated an intention to make such a distinction.  42 U.S.C. § 3604(c); 24 C.F.R. § 100.75(a), (b), (c)(1).

24. As described above, Respondent selected media or locations for advertising the sale or rental of dwellings that denied persons information about housing opportunities because of race, color, religion, sex, familial status, national origin or disability.  24 C.F.R. § 100.75(c)(3).

25. As described above, Respondent refused to publish advertising for the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin or disability. 24 C.F.R. § 100.75(c)(4).

26. As described above, Respondent required different charges or terms for advertising the sale or rental of dwellings because of race, color, religion, sex, familial status, national origin and disability.  24 C.F.R. § 100.75(c)(4).

### III. CONCLUSION

WHEREFORE, the Secretary of the United States Department of Housing and Urban Development, through the Office of the General Counsel, and pursuant to 42 U.S.C. § 3610(g)(2)(A), hereby charges Respondent with engaging in discriminatory housing practices in violation of 42 U.S.C. § 3604(a), (b), (c) and (f), and prays that an order be issued that:

1. Declares that the discriminatory housing practices of Respondent, as set forth above, violate the Fair Housing Act, 42 U.S.C. §§ 3601-19;

2. Enjoins Respondent and its agents, employees, successors, and all other persons in active concert or participation with it, from discriminating because of race, color, religion, sex, familial status, national origin or disability in any aspect of the sale, rental, use, marketing, or advertising of dwellings and related services pursuant to 42 U.S.C. § 3612(g)(3);

3. Requires Respondent's agents and employees to attend, at Respondent's cost, training that addresses the Fair Housing Act's prohibitions against discrimination in advertising;

4. Awards such damages pursuant to 42 U.S.C. § 3612(g)(3) as will fully compensate any aggrieved persons for any harm caused by Respondent's discriminatory conduct;

5. Awards the maximum civil penalty against Respondent for each violation of the Act, pursuant to 42 U.S.C. § 3612(g)(3) and 24 C.F.R. § 180.671; and

6. Awards such additional relief as may be appropriate under 42 U.S.C. § 3612(g)(3).

Respectfully submitted on this 28th day of March, 2019.

 

Jeanine Worden
Associate General Counsel for Fair Housing

 

Kathleen M. Pennington
Assistant General Counsel for Fair Housing
  Enforcement

 

Ayelet R. Weiss
Trial Attorney
U.S. Department of Housing
  and Urban Development
Office of General Counsel
451 7th St. SW, Room 10270
Washington, DC 20410
Office: (202) 402-2882
Email: ayelet.r.weiss@hud.gov