1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN JOSE DIVISION**

| | |
|---|---|
| LINDA BRADLEY, et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>T-MOBILE US, INC., et al.,<br><br>    Defendants. | Case No.  17-cv-07232-BLF<br><br>**ORDER GRANTING MOTION TO DISMISS FOURTH AMENDED CLASS AND COLLECTIVE ACTION COMPLAINT**<br><br>[Re:  ECF 143, 165] |

This is a case about employment discrimination in "the Cyber Age," *S. Dakota v. Wayfair, Inc.*, 138 S. Ct. 2080, 2097 (2018).  It has often been said that the Internet has wrought "far-reaching systemic and structural changes in the economy."  *Id.*  One of these changes is the ability for companies like Facebook to collect enormous amounts of data about people through their social media activity and online behavior more generally.  These companies have harnessed that information in many ways, including crafting so-called "targeted ads."  Targeted ads are personalized to the user, featuring the products, services, and opportunities of greatest interest to that user.  In theory, both advertisers and users benefit: Advertisers can spend their marketing dollars more efficiently, and users see more interesting content.  In Plaintiffs' view, however, this kind of targeting can also be used in insidious ways—namely, to deny access to information to certain groups of people and thereby advance discriminatory aims.  Specifically, the plaintiffs in this case believe that Defendants T-Mobile US, Inc. ("T-Mobile") and Amazon.com, Inc. ("Amazon") routinely exclude older individuals from viewing the employment ads they post on Facebook.  In an effort to stop that practice, Plaintiffs have brought this putative class action alleging violations of various federal and state laws.

Defendants move to dismiss the Fourth Amended Complaint ("4AC") on multiple grounds,

including lack of Article III standing, lack of personal jurisdiction, and failure to state a claim upon which relief may be granted.  As set forth below, the Court holds that the 4AC does not currently contain the allegations necessary to establish standing or personal jurisdiction, but that Plaintiffs have adequately justified their narrow request for jurisdictional discovery.  Accordingly, the Court GRANTS the motion to dismiss with LEAVE TO AMEND and GRANTS the request for jurisdictional discovery.

## I.    BACKGROUND

The following facts are drawn from the 4AC, which the Court must treat as true at the pleading stage, *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011).

### A.    Defendants' Alleged Conduct

The defendants in this case are T-Mobile US, Inc. ("T-Mobile") and Amazon.com, Inc. ("Amazon").  These two major U.S. companies need little introduction.  T-Mobile is one of the largest wireless companies in the United States"; it provides "wireless communications services including voice, messaging and data, to more than 71 million customers" and, as of December 2016, employs "approximately 50,000 full-time and part-time employees."  4AC ¶ 39.  Amazon is "one of the largest online retailers in the world."  *Id.* ¶ 40.  Headquartered in Seattle, Washington, it "employed 341,400 full-time and part-time employees as of December 31, 2016."  *Id.*

This suit concerns Defendants' methods of recruiting prospective employees, which Plaintiffs believe discriminate against older workers.  In particular, both Defendants allegedly use Facebook's ad platform to advertise employment opportunities at their various stores and operations.  4AC ¶¶ 39-40.  According to Plaintiffs, "Facebook has emerged as one of the largest venues for employers to seek applicants for employment and for workers to find job opportunities."  *Id.* ¶ 46.  As "the most popular social media platform in the world," *id.* ¶ 41, Facebook collects a vast amount of information about its users, *id.* ¶ 44.  Facebook then gives its advertisers "the power to use that information to determine which Facebook users will be included or excluded in the population that will receive their ads."  *Id.*  Facebook promotes such targeted advertising to employers as helping them to "minimize the cost of reaching people who are interested in news jobs and maximize the number of people who respond to employment ads."  *Id.*

United States District Court
Northern District of California

¶ 45.  Factors that advertisers can use to target ads include "age, gender, location, interests, and behaviours."  *Id.*

Defendants are alleged to have used Facebook's ad targeting functionality to recruit younger workers and not older workers.  They did this by imposing a "ceiling on the age of people who will receive their job advertisements."  4AC ¶ 82.  Plaintiffs summarize the basic practice at issue as follows:

> When an employer or an employment agency creates, purchases, and sends a Facebook ad to make workers aware of job opportunities and encourage them to apply for various jobs, Facebook requires the employers or employment agencies to select the population of Facebook users who will be eligible to receive the ad, including the age range of the users who will receive the ad.  Following Facebook's encouragement to narrowly focus ad campaigns on the "right people," including by targeting younger people, upon information and belief, Defendants have routinely focused their Facebook employment ads on users who are under 40-years-old (and sometimes on users who are under higher age thresholds).  This prevents workers who are above the selected age threshold from receiving employment ads and pursuing relevant job opportunities.

*Id.* ¶ 17.  Plaintiffs further allege that "[t]he default age setting for ads is 18 to 65+, which means that anyone who is 18-years-old or older would receive the ad."  *Id.* ¶ 63.  As a result, Plaintiffs say, "any employer or employment agency that selects a narrower and younger age range (such as ages 18 to 40) is consciously and purposefully choosing to target younger prospective applicants and thereby excluding older applicants who will not receive the ad."  *Id.*

Defendants' employment ads—and Facebook employment ads in general—are not typically for individual job opportunities; rather, they "direct the Facebook user to [the advertiser's] 'Careers' or company Facebook pages, in addition to a page on the company's website page that has information about a range of job opportunities throughout the company."  4AC ¶ 49.  Thus, the prospective applicant can view "all available positions for which she or he could apply and encourages prospective employees to apply for such positions."  *Id.*

Also relevant to this case is a function called "Why am I seeing this."  When a Facebook user sees an ad, he or she can click on the "Why am I seeing this" function to view why he or she has been selected to see that particular ad.  4AC ¶¶ 84-85.  For instance, a user might see that "T-Mobile wants to reach people ages 18 to 38 who live or were recently in the United States."  *Id.* ¶

85.  Thus, the user can view the age range that the advertiser selected.

The 4AC included the below exemplars of two age-restricted ads and the associated "Why am I seeing this" pages:







4AC ¶¶ 2, 92.  Other exemplars are attached the 4AC as Exhibit A.  ECF 140-1.

Plaintiffs allege that Defendants have employed age-restricted ads on Facebook to advertise "jobs that were located throughout the states where these employers employ workers, including jobs in this District and elsewhere in California, the District of Columbia, and Ohio." 4AC ¶ 97.  Specifically, as to T-Mobile, the 4AC alleges that "T-Mobile advertised jobs in 42 states and the District of Columbia," *id.* ¶ 39; as to Amazon, the 4AC alleges that Amazon

United States District Court
Northern District of California

advertised "for a range of positions . . . throughout the United States," *id.* ¶ 40.

**B.    The Instant Suit**

Plaintiffs contend that Defendants' use of age-restricted employment ads is part of a "pattern or practice of age discrimination in employment advertising, recruitment, and hiring." 4AC ¶¶ 89, 150.  Accordingly, Plaintiffs filed this putative class action, alleging two basic legal theories.  First, the Age Discrimination in Employment Act ("ADEA") makes it unlawful for an employer "to print or public, or cause to be printed or published, any notice or advertisement relating to employment by such employer . . . indicating any preference, limitation, specification, or discrimination, based on age."  29 U.S.C. § 623(e).  Plaintiffs believe that Defendants' advertisements "indicate a preference" for younger workers and against older workers by (1) being targeted to younger workers and excluded from older workers, and (2) informing users of the targeting through the "Why am I seeing this" function.  4AC ¶¶ 12, 151; *see* Opp. at 18-19, 22.

Second, the ADEA makes it unlawful for an employer "to fail or refuse to hire or . . . otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age."  29 U.S.C. § 623(a)(1).  Plaintiffs contend that Defendants' age-restricted advertising constitutes disparate treatment in hiring because it is disparate treatment in recruiting.  *See* Opp. at 23.  That is, employers only hire the people who apply, who are the people they recruit; by favoring younger workers in recruitment, Defendants necessarily favor them in hiring.  *Id.*; *see* 4AC ¶¶ 166, 168.

Plaintiffs allege these theories under the ADEA and similar state laws.  The operative 4AC contains eleven counts: (1) discriminatory publication or advertising by an employer, in violation of the ADEA, 29 U.S.C. § 623(e); (2) disparate treatment in recruiting and hiring, in violation of the ADEA, 29 U.S.C. § 623(a); (3) discriminatory publication or advertising by an employer, in violation of the California Fair Employment and Housing Act ("California FEHA"), Cal. Gov. Code § 12940(d); (4) discriminatory publication or advertising, in violation of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code § 2-1402.11(a); (5) discriminatory publication or advertising, in violation of the Ohio Fair Employment Practices Law ("OFEPL"), Ohio Rev. Code § 4112.02(E)(4); (6) intentional discrimination in recruiting and hiring, in

violation of the California FEHA, Cal. Gov. Code § 12940(a); (7) intentional discrimination in recruiting and hiring, in violation of the DCHRA, D.C. Code § 2-1402.11(a)(1); (8) intentional discrimination in recruiting and hiring, in violation of the OFEPL, Ohio Rev. Code §§ 4112.02(A), 4112.14(A); (9) violation of the California Unruh Civil Rights Act, Cal. Civ. Code § 51; (10) violation of the California Unruh Civil Rights Act ("Unruh Act"), Cal. Civ. Code § 51.5; (11) violation of the California Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.* Plaintiffs seek an injunction permanently enjoining Defendants from using age-restricted employment ads, as well as the other forms of relief available under the above-listed statutes. *See* 4AC ¶ 3, p. 68.

The Plaintiffs in this case consist of the Communications Workers of America ("CWA"), four individual Named Plaintiffs, a "Plaintiff Class," and a "Plaintiff Collective." The CWA is "an international labor union representing over 700,000 workers in a broad range of industries, including telecommunications, cable, information technology, airline, manufacturing, print and broadcast news media, education, public service, and healthcare." 4AC ¶ 30. The four individual Named Plaintiffs are: Linda Bradley, a 45-year-old woman living in Franklin County, Ohio, 4AC ¶ 31; Maurice Anscombe, a 57-year-old man living in Baltimore County, Maryland, *id.* ¶ 33; Lura Callahan, a 67-year-old woman living in Franklin County, Ohio, *id.* ¶ 35; and Richard Hayne, a 61-year-old man living in Oakland, California, *id.* ¶ 37. All four Named Plaintiffs are proposed representatives of a nationwide "Plaintiff Collective" of

> All persons in the United States who from the earliest date actionable under the limitations applicable to the given claim until the date of judgment in this action (1) were 40 years old or older (2) used Facebook during a time in which they were searching for employment, and (3) were excluded from being eligible to receive an employment-related advertisement or notice because one or more of the Defendants placed an upper age limit on the population of Facebook users that was eligible to receive an advertisement or notice.

*Id.* ¶ 140.[1]  In addition, Haynie is the proposed representative of a smaller "Plaintiff Class" of

> All persons who from the earliest date actionable under the limitations

---

[1] The ADEA incorporates enforcement provisions of the Fair Labor Standards Act, including the collective action provisions of 29 U.S.C. § 216(b).  *See* 29 U.S.C. § 621.

applicable to the given claim until the date of judgment in this action (1) were 40 years old or older (2) used Facebook during a time in which they were searching for employment and resided in California, and (3) were excluded from being eligible to receive an employment-related advertisement or notice because one or more Defendants placed an upper age limit on the population of Facebook users that was eligible to receive an advertisement or notice.

*Id.* ¶ 121.

The counts in the 4AC are brought by various combinations of these Plaintiffs. Specifically, the ADEA claims (Counts 1 and 2) are brought by the Named Plaintiffs and the Plaintiff Collective; the California FEHA claims (Counts 3 and 6) are brought by Haynie and the Plaintiff Class; the UCL and Unruh Act claims (Counts 10 and 11) are brought by Haynie, the CWA, and the Plaintiff Class; and the remaining claims under D.C. and Ohio state law (Counts 4, 5, 7, 8, and 9) are brought by certain Named Plaintiffs in their individual capacities.

Defendants now move to dismiss the 4AC on various grounds. ECF 143 ("Mot."). This is Defendants' third motion to dismiss the operative complaint, but the first that has come before the Court for a ruling. *See* ECF 73 (Motion to Dismiss the Third Amended Complaint ("TAC")), ECF 63 (Motion to Dismiss the First Amended Complaint ("FAC")). The motion has been fully briefed, ECF 147 ("Opp."), ECF 155 ("Reply"), and the Court conducted a hearing on January 30, 2020, ECF 164.

## II.    LEGAL STANDARDS

In the instant motion, Defendants raise three grounds for dismissing the various claims in the 4AC: lack of subject matter jurisdiction, under Federal Rule of Civil Procedure 12(b)(1); lack of personal jurisdiction, under Federal Rule of Civil Procedure 12(b)(2); and failure to state a claim, under Federal Rule of Civil Procedure 12(b)(6). Mot. at 4, 9, 15. Below, the Court reviews the relevant legal standards for each type of motion.

### C.    Rule 12(b)(1) Motion to Dismiss for Lack of Subject Matter Jurisdiction

A motion pursuant to Federal Rule of Civil Procedure 12(b)(1) tests whether the court has subject matter jurisdiction to hear the claims alleged in the complaint. A Rule 12(b)(1) motion may be either facial, where the inquiry is limited to the allegations in the complaint, or factual, where the court may look beyond the complaint to consider extrinsic evidence. *Wolfe v.*

*Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  Here, Defendants lodge a facial attack on the sufficiency of the allegations in the 4AC.  *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (in a facial attack under Rule 12(b)(1), "the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.").  A district court "resolves a facial attack as it would a motion to dismiss under Rule 12(b)(6): Accepting the plaintiff's allegations as true and drawing all reasonable inferences in the plaintiff's favor, the court determines whether the allegations are sufficient as a legal matter to invoke the court's jurisdiction." *Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014).  As with a Rule 12(b)(6) motion, however, a court is not required "to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008); *see Thomas v. Mundell*, 572 F.3d 756, 763 (9th Cir. 2009) (finding allegations "too vague" to support standing).

In the instant motion, Defendants contend that Plaintiffs lack Article III standing, which "is a necessary component of subject matter jurisdiction." *In re Palmdale Hills Prop., LLC*, 654 F.3d 868, 873 (9th Cir. 2011).  The Supreme Court has repeatedly stated that the "irreducible constitutional minimum of standing" consists of three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016).  These elements are often referred to as injury in fact, causation, and redressability. *See, e.g.*, *Planned Parenthood of Greater Washington & N. Idaho v. U.S. Dep't of Health & Human Servs.*, 946 F.3d 1100, 1108 (9th Cir. 2020).  Plaintiffs, as the parties invoking federal jurisdiction, bear the burden of establishing the existence of Article III standing and, at the pleading stage, "must clearly allege facts demonstrating each element." *Spokeo*, 136 S. Ct. at 1547 (internal quotation marks and citation omitted); *see also Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983) ("The facts to show standing must be clearly apparent on the face of the complaint.").

"In a class action, this standing inquiry focuses on the class representatives." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 532 (9th Cir.

United States District Court
Northern District of California

2019).  Standing for the putative class "is satisfied if at least one named plaintiff meets the requirements." *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007).  But if none of the named plaintiffs purporting to represent a class can establish standing to sue, the class action cannot proceed.  *See NEI Contracting*, 926 F.3d at 532 (citing *O'Shea v. Littleton*, 414 U.S. 488, 494 (1974)).

Finally, the Court notes that standing, as a limit upon the power of a federal court, must be established before the Court may proceed to the merits.  *Virginia House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1950 (2019).

### D.  Rule 12(b)(2) Motion to Dismiss for Lack of Personal Jurisdiction

Federal Rule of Civil Procedure 12(b)(2) authorizes a defendant to seek dismissal of an action for lack of personal jurisdiction.  *See* Fed. R. Civ. P. 12(b)(2).  "In opposing a defendant's motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of establishing that jurisdiction is proper." *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011).  Courts may consider evidence presented in affidavits and declarations in determining personal jurisdiction.  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  "Where, as here, the defendant's motion is based on written materials rather than an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Ranza v. Nike, Inc.*, 793 F.3d 1059, 1068 (9th Cir. 2015) (internal quotation marks and citation omitted).  "Uncontroverted allegations in the complaint must be taken as true, and factual disputes are construed in the plaintiff's favor," *Freestream Aircraft (Bermuda) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 602 (9th Cir. 2018), but a court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d at 1055.

In general, a court may exercise personal jurisdiction "if a rule or statute authorizes it to do so and the exercise of such jurisdiction comports with the constitutional requirement of due process." *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1072 (9th Cir. 2001).  "When no federal statute governs personal jurisdiction, the district court applies the law of the forum state." *Id.; see* Fed. R. Civ. P. 4(k)(1)(A).  "California's long-arm statute allows the exercise of personal

1    jurisdiction to the full extent permissible under the U.S. Constitution." *Daimler AG v. Bauman*,

2    571 U.S. 117, 125 (2014) (citing Cal. Civ. Proc. Code Ann. § 410.10).  Constitutional due process,

3    in turn, requires that a defendant "have certain minimum contacts" with the forum state "such that

4    the maintenance of the suit does not offend traditional notions of fair play and substantial justice."

5    *Freestream Aircraft*, 905 F.3d at 602 (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

6    (1945)).

7         "The strength of contacts required depends on which of the two categories of personal

8    jurisdiction a litigant invokes: specific jurisdiction or general jurisdiction."  *Ranza*, 793 F.3d at

9    1068 (citing *Daimler AG*, 571 U.S. at 127).  General jurisdiction exists when the defendant's

10   contacts "are so continuous and systematic as to render [it] essentially at home in the forum State."

11   *Daimler AG*, 571 U.S. at 127 (internal quotation marks omitted).  Where a defendant is subject to

12   general jurisdiction, it may be sued "on any and all claims," *id.* at 137, including claims "arising

13   from dealings entirely distinct" from its forum-related activities, *id.* at 127 (internal quotation

14   marks omitted).  By contrast, specific jurisdiction is proper when the defendant's contacts with the

15   forum state may be more limited but the plaintiff's claims "arise out of or relate to" those contacts.

16   *Bristol-Myers Squibb Co. v. Superior Court of California, San Francisco Cty.*, 137 S. Ct. 1773,

17   1786 (2017).  The Court discusses the requirements for specific jurisdiction in greater detail

18   below.  *See* Part III.B.

19        **E.     Rule 12(b)(6) Motion to Dismiss for Failure to State a Claim**

20        Rule 8(a)(2) of the Federal Rules of Civil Procedure requires a complaint to include "a

21   short and plain statement of the claim showing that the pleader is entitled to relief."  A complaint

22   that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure

23   12(b)(6).  In other words, "[a] motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)

24   for failure to state a claim upon which relief can be granted 'tests the legal sufficiency of a

25   claim.'"  *Conservation Force v. Salazar*, 646 F.3d 1240, 1241-42 (9th Cir. 2011) (quoting

26   *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001)).  To survive a Rule 12(b)(6) motion, a

27   complaint must contain "enough facts to state a claim to relief that is plausible on its face."  *Bell*

28   *Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the

United States District Court
Northern District of California

1    plaintiff pleads factual content that allows the court to draw the reasonable inference that the

2    defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The

3    plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

4    possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

5        In evaluating the complaint, the court must "accept factual allegations in the complaint as

6    true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v.*

7    *St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). At the same time, a court

8    need not accept as true "allegations that contradict matters properly subject to judicial notice" or

9    "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable

10   inferences." *In re Gilead*, 536 F.3d at 1055 (internal quotation marks and citations omitted).

## III.    DISCUSSION

12       Again, Defendants move to dismiss the 4AC on three grounds: lack of subject matter

13   jurisdiction, under Federal Rule of Civil Procedure 12(b)(1); lack of personal jurisdiction, under

14   Federal Rule of Civil Procedure 12(b)(2); and failure to state a claim, under Federal Rule of Civil

15   Procedure 12(b)(6). The Court begins, as it must, with Defendants' jurisdictional arguments under

16   Rules 12(b)(1) and 12(b)(2). *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 577 (1999)

17   ("[J]urisdiction generally must precede merits in dispositional order."). Finding them to be

18   meritorious, the Court must dismiss the 4AC without ruling on Defendants' Rule 12(b)(6) motion.

19   However, because the Court grants leave to amend the 4AC, the Court also provides brief

20   guidance as to the substantive elements of Plaintiffs' causes of actions.

### A.    Motion to Dismiss for Lack of Standing

22        The Court begins with Defendants' motion to dismiss the 4AC for lack of standing. As

23   noted above, Article III standing requires injury in fact, causation, and redressability. Defendants

24   first argue that the individual named plaintiffs have failed to meet their burden of pleading these

25   elements, which precludes standing for the putative Plaintiff Class and Plaintiff Collective.

26   Defendants also raise several separate objections to CWA's associational standing.

27        The Court separately addresses the parties' arguments as to the individual named plaintiffs

28   and their arguments regarding CWA.

11

### i.   Individual Named Plaintiffs

To briefly review, there are four individual named plaintiffs in this case: Linda Bradley, Maurice Anscombe, Lura Callahan, and Richard Haynie (collectively, the "Named Plaintiffs"). Plaintiffs say they have suffered various injuries as a result of Defendants' allegedly illegal conduct, including: informational injury; the denial of jobs, and the lost wages incident thereto; the denial of the opportunity to apply for jobs; and stigmatic injury.  The Court holds that the denial of the opportunity to apply for jobs, if properly alleged, would confer standing upon the Named Plaintiffs.  Nevertheless, the Court must grant the motion to dismiss because the allegations in the 4AC are too vague and conclusory to establish that the Named Plaintiffs—rather than unidentified members of the Plaintiff Class—personally experienced the complained-of injuries.

### a.   Standing, In General

The Supreme Court has written at length about Article III's requirements of injury in fact, causation, and redressability.  An injury in fact is "an invasion of a legally protected interest" that is (1) "concrete," (2) "particularized," and (3) "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan*, 504 U.S., at 560).  First, a "concrete" injury is one that "actually exist[s]"; that is, it is "real" and not "abstract." *Id.*  Although both tangible and intangible injuries may be concrete, *id.*, the courts have sometimes struggled with identifying when intangible harms are sufficiently concrete.  Fortunately, that issue is not presented here.  Second, "[f]or an injury to be 'particularized,' it must affect the plaintiff in a personal and individual way," *id.*; the plaintiff must have a "direct stake in the controversy." *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 687 (1973).  It is pursuant to this principle that the Supreme Court has rejected suits by litigants asserting "generalized grievances about the conduct of government," *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 612 (2007), which are "undifferentiated and common to all members of the public." *Lujan*, 504 U.S. at 575; *see also Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) ("[G]eneralized harm to the forest or the environment will not alone support standing.").  Third, the requirement that an injury be "actual or imminent" "ensure[s] that the

1    alleged injury is not too speculative for Article III purposes—that the injury is certainly

2    impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

3         There must, moreover, be a sufficient "causal connection between the injury and the

4    conduct complained of." *United States v. Hays*, 515 U.S. 737, 743 (1995).  Standing theories that

5    depend on a "speculative chain of possibilities"—such as those that turn on "the decisions of

6    independent actors"—lack the necessary causal connection.  *Clapper*, 568 U.S. at 414; *see also*

7    *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 447 (9th Cir. 1994) ("[W]hen standing

8    hinges on choices made by a third party, plaintiff must "adduce facts showing that those choices

9    have been or will be made in such manner as to produce causation and permit redressability of

10   injury.") (quoting *Lujan*, 504 U.S. at 562).  This causation requirement is closely linked to the

11   redressability requirement, i.e., that it be "likely, as opposed to merely speculative, that the injury

12   will be redressed by a favorable decision."  *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.*

13   *(TOC), Inc.*, 528 U.S. 167, 181 (2000).

14                          **b.  Plaintiffs' Alleged Injuries**

15        Defendants contend that none of Plaintiffs' four alleged injuries suffices under the above

16   standards.  The Court first considers Plaintiffs' contention that they experienced informational

17   injury.  Opp. at 3.  Plaintiffs argue that, in preventing them from seeing the Facebook ads,

18   Defendants "denied them information about jobs that the law requires them to receive on an equal

19   basis." *Id.*  Plaintiffs rely upon *Havens Realty Corporation v. Coleman*, in which the Supreme

20   Court held that black testers who had no intention of buying or renting a home nevertheless had

21   standing to enforce their statutory right "to truthful information concerning the availability of

22   housing," because they had been injured by receiving false information.  455 U.S. 363, 374

23   (1982).  The injury, in other words, was the tester's "statutory right to truthful housing

24   information." *Id.* at 375; *see also Kyles v. J.K. Guardian Sec. Servs., Inc.*, 222 F.3d 289, 297 (7th

25   Cir. 2000) (following *Havens*).  These so-called "tester" cases are inapposite, however, because

26   they involve litigants who *sought* and were then denied truthful information.  The Plaintiffs in this

27   case did not seek employment information from Defendants.  That distinction is important because

28   the *Havens* Court also rejected the proposition that all black people had standing: Plaintiff Willis

lacked standing because he had not received false information and thus had not been injured.  455 U.S. at 375.  The Court finds that the type of information injury in *Havens* is not present here.

Second, Plaintiffs say they have "lost wages due to losing out on jobs 'they would have pursued and obtained'" had they seen the age-restricted ads.  Opp. at 2 (quoting 4AC ¶ 247).  Defendants object that, though lost wages are undoubtedly concrete, this "supposed injury" rests on a "highly attenuated chain of possibilities."  Reply at 7 (quoting *Clapper*, 568 U.S. at 410-12).  That is, Defendants believe redressability is lacking because Plaintiffs have not shown that they would have applied for and received the jobs if they had seen the ads in question.  The point is well-taken.  Accepting Plaintiffs' allegation that they "would have pursued" some of the advertised jobs, 4AC ¶¶ 32, 34, 36, 38, many factors may have affected whether Plaintiffs would have then been hired.  Hence, the Court agrees that the injury in cases like this one should not be cast in terms of lost wages; instead, "the injury lies in the denial of an equal opportunity to compete, not the denial of the job itself."  *Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015).  That is, of course, Plaintiffs' third alleged injury: the denial of the opportunity to apply for jobs because of their age.

It is well-established that the denial of an opportunity to obtain a benefit is itself an injury in fact.  *See, e.g.*, *Robertson v. Allied Sols.*, LLC, 902 F.3d 690, 697 (7th Cir. 2018) ("Article III's strictures are met not only when a plaintiff complains of being deprived of some benefit, but also when a plaintiff complains that she was deprived of a chance to obtain a benefit.").  Consider, for example, challenges to race-based set aside programs—that is, programs requiring that a certain percentage of government contracts go to minority-owned businesses.  *See, e.g.*, *Northeastern Fla. Chapter, Associated Gen. Contractors of America v. Jacksonville*, 508 U.S. 656, 660-61 (1993).  In such cases, the Supreme Court has said that "the injury in fact is the inability to compete on an equal footing in the bidding process, not the loss of contract."  *Id.* at 667; *see also Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 211 (1995) (internal quotation marks and alterations omitted) ("The injury in cases of this kind is that a discriminatory classification prevents the plaintiff from competing on an equal footing.").

That injury has also been recognized in cases challenging allegedly discriminatory criteria

14

rather than strict quotas.  For instance, in affirmative action cases, the Supreme Court has identified the injury in fact as the denial of "the opportunity to compete for admission on an equal basis."  *Gratz v. Bollinger*, 539 U.S. 244, 261–62 (2003); *see also Regents of Univ. of California v. Bakke*, 438 U.S. 265, 281 (1978) (finding Article III injury not in the "failure to be admitted" but "in the University's decision not to permit Bakke to compete for all 100 places in the class, simply because of his race").  Other examples include programs for awarding public benefits to individuals, *e.g.*, *Carroll v. Nakatani*, 342 F.3d 934, 941 (9th Cir. 2003), or public funding to entities, *e.g.*, *Planned Parenthood*, 946 F.3d at 1108.

And because the injury is the denial of the chance to seek the benefit, "the aggrieved party need not allege that he would have obtained the benefit but for the barrier in order to establish standing."  *Adarand*, 515 U.S. at 211 (internal quotation marks omitted); *see also Planned Parenthood*, 946 F.3d at 1108 (explaining that a plaintiff "need not participate in the competition" to suffer injury in fact, so long as it is "able and ready" to do so); *Scott v. Pasadena Unified Sch. Dist.*, 306 F.3d 646, 657 (9th Cir. 2002) ("The individual plaintiffs in the present action are not required to demonstrate that but for the weighted lottery process they would obtain admission to one of the voluntary schools.").  Redressability is satisfied in that removal of the barrier restores or increases the litigant's chances of obtaining the benefit.

These situations are closely analogous to the one at hand.  The 4AC alleges that Defendants imposed age restrictions on their Facebook ads that prevented the Named Plaintiffs from seeing the ads and thereby learning about various job openings at Amazon and T-Mobile. *See, e.g.*, 4AC ¶¶ 32- 38.  Because they did not become aware of these job openings, they were unable to apply.  After all, knowledge of the job openings is a prerequisite for Plaintiffs to apply and compete for those jobs.  Defendants' allegedly discriminatory conduct—i.e., the age restriction on the employment ads—constituted a barrier to Plaintiffs' knowledge.  The removal of that barrier restores—indeed, it creates—Plaintiffs' opportunity to compete for the advertised jobs, thus redressing their injury.

It bears emphasizing that Plaintiffs' theory is that they were literally prevented from applying when they were prevented from learning about the positions.  As a result, Plaintiffs need

not show that they were "effectively deterred" from applying, Mot. at 11, or that applying "would have been a futile gesture," Mot. at 12.  These standards arose to deal with factual situations that are quite different from the one at hand.  Courts use those standards to assure causation, separating cases in which a plaintiff was "discouraged from applying" from those in which the plaintiff "simply failed to do so."  *Breiner v. Nevada Dep't of Corr.*, 610 F.3d 1202, 1206 (9th Cir. 2010); *see Hailes v. United Air Lines,* 464 F.2d 1006, 1008 (5th Cir. 1972).  If a plaintiff "simply failed" to apply, that failure could not be attributed to the defendant's actions.  But there is no question of causation where, as here, Plaintiffs allege that it was not within their power to apply because they were unaware of the jobs.

In other words, just as the plaintiffs in *Northeastern Florida* were purportedly denied an opportunity to bid on certain contracts, the named plaintiffs in this case were denied an opportunity to apply for certain jobs.  The Court therefore finds that Article III standing could properly be grounded in the denial of Plaintiffs' opportunity to apply for jobs, though not in the denial of the jobs themselves.

Nevertheless, the Court agrees with Defendants that Plaintiffs have not adequately alleged that they personally have experienced such injuries.  Time and again courts have emphasized that "[t]he existence of a racial or gender barrier is not enough to establish standing, without a plaintiff's showing that she has been . . . subjected to such a barrier."  *Braunstein v. Arizona Dep't of Transp.*, 683 F.3d 1177, 1185 (9th Cir. 2012) (quoting *Scott*, 306 F.3d at 657).  Members of the disfavored group do not automatically have a "direct stake in the controversy," *SCRAP*, 412 U.S. at 687; they are merely "concerned bystanders" unless they personally experience the discriminatory conduct.  *Allen v. Wright*, 468 U.S. 737, 755-56 (1984), *abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014).  This principle applies with equal force in cases of age-based discrimination.  Moreover, in class actions, "named plaintiffs who represent a class must allege and show that they personally have been injured, not that injury has been suffered by other, unidentified members of the class to which they belong and which they purport to represent."  *Lewis v. Casey*, 518 U.S. 343, 357 (1996) (internal quotation marks and citation omitted).

United States District Court
Northern District of California

Here, that means that the Named Plaintiffs must show that they were deprived of the opportunity to apply for jobs.  To do so, Plaintiffs must plausibly allege that they were "able and ready" to apply for one or more of the jobs advertised using age-restricted ads.  *See, e.g.*, *Planned Parenthood*, 946 F.3d at 1108 ("It is a plaintiff's ability and readiness to bid that ensures an injury-in-fact is concrete and particular."); *Gratz*, 539 U.S. at 261–62 (plaintiff had standing to challenge university's race-conscious transfer admissions policy, even though he never applied as a transfer student, because he demonstrated that he was "able and ready" to do so); *see generally Breiner*, 610 F.3d at 1206 ("[A] nonapplicant suffers an invasion of a legally protected interest . . . if he would have applied for the job had it not been for the employer's discriminatory practices."). In this context, to be "able" means qualified and to be "ready" means seeking employment and genuinely interested in the position.  *Cf. Bates*, 511 F.3d at 988 (Habib had standing to challenge hearing standard because there was no other qualification standard "that prevented him from applying for the job"); *Wilson v. Glenwood Intermountain Properties, Inc.*, 98 F.3d 590, 596 (10th Cir. 1996) ("Persons who merely see a discriminatory advertisement" but are not interested in the advertised housing or lack qualifications are no more than "concerned bystanders.").

Plaintiffs maintain that the 4AC contains the necessary allegations to show each of the Named Plaintiffs have been denied the opportunity to apply for jobs with Defendants.  Opp. at 5. The 4AC alleges that each of the Named Plaintiffs were "qualified to perform one or more jobs at each of the Defendants that was offered during the time period at issue" and that they would have "pursued" those "specific job opportunities."  *See* 4AC ¶¶ 31-38.  The 4AC further alleges that the Facebook ads for these jobs were subject to age restrictions and that, as a result, the Named Plaintiffs did not receive the ads and did not learn about the jobs.  *Id.*  Importantly, however, the 4AC does not identify—even by way of example—a single job for which these allegations are true.  That is a fatal failing.  The Third Circuit's decision in *Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J.* is instructive on this point.  907 F.2d 1408 (3d Cir. 1990).  There, the court held that the plaintiffs lacked standing to challenge Harrison, New Jersey's residency requirement for municipal jobs as having a disparate impact on blacks.  *Id.* at 1409, 1412, 1416.  The court explained: "The fact that Harrison may have been utilizing employment practices which had a

discriminatory impact on blacks does not, in and of itself, mean . . . that every black who may have been generally interested in jobs similar to those offered by Harrison during this period were thereby injured by those practices." *Id.* at 1416.

So too here. To establish personalized injury, the Named Plaintiffs must show they were qualified for and interested in *the particular jobs* subject to Defendants' allegedly discriminatory practices. Those jobs could either be advertised on the face of the Facebook ad or be posted on a website—such as a Defendant's Careers page—to which the ad linked. Yet, the 4AC alleges generally that T-Mobile and Amazon advertised "for a range of positions," 4AC ¶¶ 39-40, without providing any description or examples of these positions to suggest that the Named Plaintiffs would have been able and ready to apply for them. The broad allegation that "one or more" such positions exist as to each Named Plaintiff is, by itself, merely conclusory. And although the 4AC suggests certain job titles for which each Named Plaintiff would be qualified, *see, e.g.*, *id.* ¶ 37 ("Mr. Haynie would be qualified for a range of positions at T-Mobile, including but not limited to Technology Innovation Designer Videographer"), the 4AC does not allege that there were open positions for those job titles during the relevant time period—much less that those positions were advertised using age-restricted ads. To be sure, there are likely to be members of the Plaintiff Class that were prevented from seeing ads for jobs to which they were able and ready to apply, and thus were deprived of the opportunity to so apply. But under the allegations in the 4AC, the Named Plaintiffs have not demonstrated that they themselves experienced that deprivation.

Plaintiffs' fourth alleged injury—stigmatic injury—fails for the same reason. Stigmatic injury—i.e., "stigmatizing members of the disfavored group as innately inferior and therefore as less worthy"—certainly may confer Article III standing in discrimination cases. *Heckler v. Mathews*, 465 U.S. 728, 739 (1984). Nonetheless, not every member of the disfavored group is stigmatized for standing purposes by virtue of discriminatory conduct. *Allen*, 468 U.S. 755-56. As the Supreme Court has said, stigmatic injury "accords a basis for standing only to those persons who are personally denied equal treatment by the challenged discriminatory conduct." *Id.* at 755. Having failed to show that the Named Plaintiffs were denied the opportunity to apply for jobs in which they were interested and for which they were qualified, Plaintiffs also have not

shown that they were stigmatized by that denial.  At most, Plaintiffs have pleaded that they are members of the disfavored group—older workers.  Plaintiffs can only establish stigmatic injury to the extent they can establish the denial of the opportunity to apply; the two theories of injury rise and (in this case) fall together.

In sum, to have Article III standing, the Named Plaintiffs must show that (1) there were jobs for which they were qualified and (2) in which they were genuinely interested that (3) the Defendants advertised using age-restricted Facebook ads and (4) about which the Named Plaintiffs never learned.  They have not done so, and therefore lack standing to bring this suit.

### ii.   Associational Standing of CWA

The Court now turns to the standing of CWA, which is a plaintiff for various claims in the 4AC.  An association may have standing in either of two ways: (1) first-party standing, on its own behalf, *see, e.g.*, *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 904 (9th Cir. 2002), or (2) third-party standing, on behalf its members, *see, e.g.*, *Am. Diabetes Ass'n v. United States Dep't of the Army*, 938 F.3d 1147, 1155 (9th Cir. 2019).  CWA asserts only the latter, Opp. at 7, which requires a showing that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purposes; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Id.*

Plaintiffs have not met their burden of showing that CWA's members would have standing to sue in their own right.  To meet this requirement, Plaintiffs need only show that one of CWA's members has standing.  *See Carrico v. City & Cty. of San Francisco*, 656 F.3d 1002, 1005 (9th Cir. 2011).  Here, Plaintiffs offer the three Named Plaintiffs who are also members of CWA: Bradley, Anscombe, and Callahan.  *See* 4AC ¶¶ 31, 33, 35.  However, the Court's above determination that their standing has not been adequately alleged also means that these Named Plaintiffs cannot establish CWA's standing.

At the hearing, Plaintiffs also pointed to its broad allegation that "[n]umerous members of CWA who are also members of the proposed Class reside in this District and elsewhere in California, and they have been denied advertisements about jobs at Amazon and T-Mobile within

United States District Court
Northern District of California

the State of California concerning jobs in this District."  4AC ¶ 30.  Plaintiffs believe this

allegation suffices because "[i]n this Circuit, organizational plaintiffs need not 'specifically

identif[y] a member of the organization to establish standing for the organization.'"  ECF 164

("Tr.") at 24; *see* ECF 91 at 44 (quoting *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032,

1041 (9th Cir. 2015)).  Plaintiffs are incorrect.  The cited case refers to the pleading standard for

*first-party standing*, not third-party standing on behalf of an organization's members.  An

organization has first-party standing if it can show "(1) frustration of its organizational mission;

and (2) diversion of its resources to combat the particular conduct at issue," *Am. Diabetes Ass'n*,

938 F.3d at 1154, and it is unsurprising that identification of individual members is unnecessary to

do make that showing.  By contrast, the Supreme Court has required "individual affidavits" from

members in order for an organization to plausibly allege third-party standing.  *Summers*, 555 U.S.

at 499 ("Without individual affidavits, how is the court to assure itself that the Sierra Club, for

example, has 'thousands of members' who 'use and enjoy the Sequoia National Forest'?").

"While it is certainly possible—perhaps even likely—that one individual will" be able to establish

standing to sue, "that speculation does not suffice."  *Id.*  Hence, Plaintiffs have not made a

sufficient showing that CWA's members would have standing to sue in their own right.

Defendants also oppose CWA's standing on the basis of the third prong—that "neither the

claim asserted nor the relief requested requires the participation of individual members in the

lawsuit."  Mot. at 14.  Unlike the first two, this prong is not mandated by Article III; it is "merely

prudential," "designed to promote efficiency in adjudication."  *Cent. Delta Water Agency v.

United States*, 306 F.3d 938, 951 n.9 (9th Cir. 2002).  More to the point, it is not typically

implicated where, as here, the organization does not seek damages on behalf of its members, *see*

Opp. at 7 ("CWA does not seek (and waives any right to) monetary damages.").  *See, e.g.*, *Alaska

Fish & Wildlife Fed'n & Outdoor Council, Inc. v. Dunkle*, 829 F.2d 933, 938 (9th Cir. 1987)

("[B]ecause the Fund seeks declaratory and prospective relief rather than money damages, its

members need not participate directly in the litigation."); *United Food & Commercial Workers

Union Local 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546 (1996) (affirming prior holding that

"individual participation is not normally necessary when an association seeks prospective or

injunctive relief for its members"). In this case, the Court does not see any special need for the individual participation of CWA's members. "Although the participation of some individual plaintiffs may be needed to present the case for injunctive relief, it is highly unlikely that the participation of each injured plaintiff will be required." *Asociacion De Productores v. California Avocado Comm'n*, No. SACV08570JVSFFMX, 2009 WL 10698881, at *3 (C.D. Cal. Apr. 2, 2009). The Court therefore rejects Defendants' contention that "individualized proof" is necessary and precludes CWA's associational standing.

Finally, the parties do not dispute that the interests CWA seeks to protect are germane to its purpose. *See* Mot. at 14; Reply at 10. Accordingly, the only barrier to CWA's standing is its ability to adequately plead the standing of at least one member.

\*\*\*

Because neither the individual Named Plaintiffs nor CWA has standing to bring this suit, the Court must GRANT the motion to dismiss the 4AC for lack of Article III standing.

### B.   Motion to Dismiss for Lack of Personal Jurisdiction

Defendants also move to dismiss the 4AC for lack of personal jurisdiction. Mot. at 5-9. It is well-established that, without jurisdiction, a court is "powerless to proceed to an adjudication." *Ruhrgas*, 526 U.S. at 584. The Plaintiffs' failure to establish Article III standing means that the Court does not have subject matter jurisdiction. It is equally clear, however, that "[j]urisdiction is vital only if the court proposes to issue a judgment on the merits." *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 431 (2007). "Personal jurisdiction, too, is an essential element of the jurisdiction of a district court." *Ruhrgas*, 526 U.S. at 584 (internal quotation marks and alterations omitted). Accordingly, and to aid Plaintiffs' likely amendment of its complaint, the Court now recognizes that the Court's lack of personal jurisdiction over Defendants is another jurisdictional barrier to Plaintiffs' suit.

At the outset, the Court confirms that "Defendants have not waived their personal jurisdiction defense." Mot. at 9. The 4AC alleges that Facebook's Terms of Service contain a choice of venue provision requiring its users "to resolve any disputes related to their use of Facebook in the U.S. District Court for the Northern District of California or a state court located

in San Mateo County" and to "submit to the personal jurisdiction of such courts."  4AC ¶ 27.  The

4AC alleges that Defendants agreed to these Terms of Service and have thus "consented to

personal jurisdiction and venue in this Court and have waived any argument that exercising

personal jurisdiction over them with respect to their discriminatory advertising on Facebook is

improper, unlawful, or unconstitutional."  *Id.*  In response, Defendants have submitted a copy of

the Terms of Service, ECF 143-2, which are incorporated by reference into the 4AC and thus may

be considered on a motion to dismiss.  *See Swartz v. KPMG LLP*, 476 F.3d 756, 763 (9th Cir.

2007) (affirming that "a court may consider a writing referenced in a complaint but not explicitly

incorporated therein if the complaint relies on the document and its authenticity is unquestioned").

The full venue provision contained therein states that it applies to disputes "against us"—i.e.,

Facebook.  As Facebook is not a party to the instant action, the Court agrees with Defendants that

the venue provision does not apply here.  Meanwhile, Plaintiffs' briefing does not challenge the

accuracy of Defendants' copy of the Terms of Service or otherwise advance the waiver allegation

made in the 4AC.  The Court therefore finds that Defendants have not waived their personal

jurisdiction challenge.

With regard to that challenge, Defendants contend that their contacts with California are

insufficient to justify either general or specific jurisdiction.  In response, Plaintiffs assert that this

Court has specific jurisdiction over the claims for which Haynie and/or the CWA are plaintiffs.

*See* Opp. at 7-8.  They concede that the Court would not have specific jurisdiction over the claims

brought by Bradley, Anscombe, and Callahan in their individual capacities.  Tr. at 22.  Plaintiffs

therefore ask the Court to exercise pendent personal jurisdiction over them instead.  *See id.*; Opp.

at 14.

### iii.   Specific Jurisdiction

The Court begins with specific jurisdiction, which Plaintiffs assert as to the claims brought

by Haynie and the CWA—i.e., the claims under the ADEA and California law.[2]  The Ninth

Circuit has set forth a three-prong test for whether a defendant has the "minimum contacts"

---

[2] Counts 1, 2, 3, 6, 9, 10, 11.

United States District Court
Northern District of California

necessary for specific jurisdiction:

> (1) the defendant must either "purposefully direct his activities" toward the forum or "purposefully avail himself of the privileges of conducting activities in the forum";
> (2) "the claim must be one which arises out of or relates to the defendant's forum-related activities"; and
> (3) "the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable."

*Axiom Foods, Inc. v. Acercham Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1111 (9th Cir. 2002)).  "The plaintiff bears the burden of satisfying the first two prongs of the test."  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).  If the plaintiff makes a prima facie showing as to those first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable."  *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)).

Defendants argue that Plaintiffs have not satisfied their burden of establishing the first and second prongs, and the Court agrees.

The first prong of the specific jurisdiction test is met if the defendant "purposefully directed" his activities toward the forum or "purposefully availed" himself of "the privileges of conducting activities in the forum."  The Ninth Circuit has said that "purposeful availment" and "purposeful direction" are "two distinct concepts."  *Schwarzenegger*, 374 F.3d at 802.  The former applies to claims sounding in contract whereas the latter applies to claims sounding in tort.  *Picot v. Weston*, 780 F.3d 1206, 1212 (9th Cir. 2015).  Because Plaintiffs' claims of discrimination are "more akin to tort claims," the Court employs the purposeful direction framework.  *Ziegler v. Indian River Cty.*, 64 F.3d 470, 474 (9th Cir. 1995) (citing with approval an ADEA case in which the district court applied the tort-case standard); *see* Opp. at 9.

Purposeful direction, in turn, can be shown in two ways.  First, the Ninth Circuit has said that "the commission of an intentional tort in a state is a purposeful act that will satisfy" the purposeful direction test.  *Freestream Aircraft*, 905 F.3d at 603.  In other words, if the "allegedly intentional tortious conduct" occurred in the forum state, that conduct has plainly been purposefully directed at the forum state.  *Id.*  Alternatively, if the defendant's conduct "takes place

23

outside the forum," there may still be purposeful direction if that conduct "has effects inside the forum state." *Id.* at 604.  This second method of showing purposeful direction is known as the "effects" test from *Calder v. Jones*, 465 U.S. 783 (1984).  *Axiom Foods*, 874 F.3d at 1069.

Plaintiffs advance both theories of purposeful direction, arguing (1) that "Defendants' discriminatory conduct occurred in California," Opp. at 8, and (2) that Defendants "directed their biased advertising and recruiting activities to California," Opp. at 10.  The Court considers each in turn.

As to the first theory, Plaintiffs argue that Defendants' acts of discrimination occurred in California because "the ads were created in California and published to California residents." Opp. at 9.  Specifically, Plaintiffs point to allegations that Defendants:

- "[I]ntentionally created and purchased discriminatory ads in this District via Facebook's ad platform that is located in this District," 4AC ¶ 22;

- "[I]nteracted with Facebook's employees who are located in this District to create, purchase, and publish" the ads, *id.*; and

- "[U]sed Facebook's delivery algorithm in California," Opp. at 9 (citing 4AC ¶ 83).

According to Plaintiffs, these allegations show that Defendants' tortious activity occurred in California because "the Ninth Circuit has held that violations of employment discrimination laws occur both were unlawful decisions are made and where those decisions are implemented."  Opp. at 9 (citing *Passantino v. J&J Consumer Prods.*, 212 F.3d 493, 504-05 (9th Cir. 2000)).

Where, as here, Defendants are alleged to have violated the anti-discrimination laws through online activity, the question of where the tortious activity "occurred" is a somewhat metaphysical one.  *Passantino*—upon which Plaintiffs rely—does not provide an answer.  As Defendants correctly point out, *Passsantino* concerned the proper construction of Title VII's venue provision, not the minimum contacts analysis of personal jurisdiction.  Reply at 3; *see* 212 F.3d at 504-06.  Nor is the Court aware of any other case supporting Plaintiffs' view.  For instance, *Freestream Aircraft*—which clarified the Ninth Circuit's jurisprudence in this area— involved more straightforward facts.  There, the defendant had "committed the intentional tort of defamation while present in the forum state": He spoke the allegedly defamatory oral statements

United States District Court
Northern District of California

1    while physically present in Nevada.  *Id.* at 601-03.  Here, by contrast, it is not alleged that any of

2    Defendants' actions was carried out through employees located in California, or that Defendants

3    were otherwise present in the forum state when they "created and purchased" the ads, "interacted"

4    with Facebook, or "used" the algorithm.

5         The Court is also mindful of the U.S. Supreme Court's recent admonition that the

6    minimum contacts analysis focuses upon "contacts that the defendant *himself* creates with the

7    forum State" and not the contacts of a third party with whom the defendant is associated.  *Walden*

8    *v. Fiore*, 571 U.S. 277, 284 (2014) (emphasis in original).  That Facebook's ad platform and

9    Facebook employees are allegedly located in this District goes to Facebook's contacts with

10   California, not Defendants'.  Stripping away Facebook's conduct, the Court sees no allegations of

11   conduct by Defendants' themselves that occurred in California.  The Court is therefore skeptical

12   that, based on Plaintiffs' allegations, it can fairly be said that Defendants' allegedly tortious

13   conduct "occurred" in California.

14        Nor is the Court persuaded that Plaintiffs have adequately alleged their theory under the

15   *Calder* effects test.  The *Calder* effects test requires that the defendant have "(1) committed an

16   intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows

17   is likely to be suffered in the forum state."  *Axiom Foods*, 874 F.3d at 1069 (internal quotation

18   marks and citation omitted).  Beginning with the first element, the Ninth Circuit has explained that

19   the "intentional act" requirement means an "actual, physical act in the real world"; it does not

20   require "an intent to accomplish a result or consequence of that act."  *Brayton Purcell LLP v.*

21   *Recordon & Recordon*, 606 F.3d 1124, 1128 (9th Cir. 2010) (internal quotation marks and citation

22   omitted).  The parties seem to agree that Defendants are alleged to have committed several

23   "intentional acts," including: creating and purchasing Facebook ads that solicited workers to apply

24   for jobs, directing those ads to Facebook users located in California and throughout the United

25   States, and excluding older workers from receiving the ads.  4AC ¶¶ 22-24.  The question becomes

26   whether these acts were "expressly aimed" at California, as required to satisfy the second element

27   of the *Calder* effects test.  *Axiom Foods*, 874 F.3d at 1069.

28        Courts have "struggled with the question whether tortious conduct on a nationally

accessible website is expressly aimed at any, or all, of the forums in which the website can be viewed." *Mavrix Photo, Inc.*, 647 F.3d at 1229.  As relevant here, though, most courts have concluded that a nationwide advertising campaign is not "expressly aimed" to each state in which the advertisement appears.  *See, e.g.*, *Cybersell, Inc. V. Cybersell, Inc.*, 130 F.3d 414, 418-19 (9th Cir. 1997); *Surface Supplied Inc. v. Kirby Morgan Dive Sys., Inc.*, No. C 13-575 MMC, 2013 WL 2355446, at *4 (N.D. Cal. May 29, 2013) ("Advertising in national publications or on Facebook and Twitter, however, is not sufficient to support a finding of purposeful availment."); *JibJab Media Inc. v. White Castle Mgmt.*, No. CV1204178MMMJEMX, 2013 WL 12123696, at *6 (C.D. Cal. May 14, 2013) ("The fact that a defendant does not prevent its online content from reaching residents of the forum state does not, however, demonstrate that it purposefully directed its online activities towards any individual residing forum state."); *see also Cascade Corp. v. Hiab–Foco AB*, 619 F.2d 36, 37–38 (9th Cir. 1980) (finding no specific jurisdiction where defendant advertised in "national publications" circulated in forum, visited forum on two occasions, and mailed accusatory letters to plaintiff in forum); *but see In re Oreck Corp. Halo Vacuum & Air Purifiers Mktg. & Sales Practices Litig.*, No. ML 12-2317 CAS JEMX, 2012 WL 6062047, at *8 (C.D. Cal. Dec. 3, 2012).  There must be "something more" to demonstrate that the defendant directed his activity toward the forum state.  *Cybersell*, 130 F.3d at 418.

In *Mavrix*—the case upon which Plaintiffs principally rely—that "something more" was found in the subject matter of the website, which had a "specific focus on the California-centered celebrity and entertainment industries."  647 F.3d at 1230.  But here, unlike in *Mavrix*, the content of the advertisements did not specifically target California residents or focus on jobs available in California.  *Accord DFSB Kollective Co. v. Bourne*, 897 F. Supp. 2d 871, 882 (N.D. Cal. 2012) ("Here, Plaintiffs do not allege that any of the advertisements on Defendant's Websites targeted Californians.").  Although Plaintiffs allege that "Amazon and T-Mobile each sent at least hundreds of thousands of age-restricted advertisements to Facebook users throughout the United States, including users in California and in this District," 4AC ¶ 25, and that Defendants "advertised thousands of jobs that are located in California," *id.* ¶ 24, these allegations are unsupported and conclusory.  Plaintiffs do not cite any examples of age-restricted ads sent to Californians or

advertising job openings located in California, or otherwise explain the factual basis for their allegations.  The only examples Plaintiffs do cite are three ads that were not subject to the challenged age restriction; they were visible to all "people ages 18 and older."  ECF 154-2.  In the Court's view, these ads cannot support an inference that Defendants sent age-restricted ads to Californians.  They do support an inference that Defendants used non-age-restricted ads in California, but it cannot be said that Plaintiffs' claims "arise out of" non-age-restricted ads.

All told, Plaintiffs' allegations appear to be based on nothing more than the fact that California is part of the United States and the lack of any evidence that Defendants exempted California from their nationwide campaign.  That is simply not enough to establish that Defendants' "expressly aimed" the challenged advertisements at California.  As a result, Plaintiffs have not adequately pleaded specific jurisdiction.

### iv.    Pendent Personal Jurisdiction

As to the claims brought by Bradley, Anscombe, and Callahan in their individual capacities under Ohio and D.C. law[3], Plaintiffs ask the Court to exercise pendent personal jurisdiction.  The doctrine of pendent personal jurisdiction—which has been adopted by the Ninth Circuit—permits a court to exercise personal jurisdiction over "a claim for which there is no independent basis of personal jurisdiction so long as it arises out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction." *CE Distribution, LLC v. New Sensor Corp.*, 380 F.3d 1107, 1113 (9th Cir. 2004).  It is a discretionary doctrine.  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).  That is, even if a claim "arises out of a common nucleus of operative facts" as a claim over which a district court has personal jurisdiction, the court may "dismiss the pendent claims where considerations of judicial economy, convenience and fairness to litigants so dictate." *Id.* at 1181.

Of course, in this case, there are no claims over which the Court properly has personal jurisdiction, for the Court has dismissed the claims of Haynie and the CWA.  As a result, the Court

---

[3] Counts 4, 5, 7, and 8.

United States District Court
Northern District of California

necessarily lacks personal jurisdiction over Bradley's, Anscombe's, and Callahan's claims. The Court need not consider whether it could or should exercise pendent personal jurisdiction over these claims if the Court did have jurisdiction over the claims of Haynie and the CWA. Those issues—which Defendants did not address in their briefing—will be left to another day.

### C.   Leave to Amend and Jurisdictional Discovery

Having found that the 4AC must be dismissed, the Court now considers whether to permit leave to amend and whether to grant jurisdictional discovery.

### v.   Leave to Amend

Under Federal Rule of Civil Procedure Rule 15(a), leave to amend "shall be freely given when justice so requires," bearing in mind "the underlying purpose of Rule 15 to facilitate decisions on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (alterations and internal quotation marks omitted). Accordingly, the Ninth Circuit has instructed district courts to grant leave to amend unless one or more of the following factors is present: (1) undue delay, (2) bad faith or dilatory motive, (3) repeated failure to cure deficiencies by amendment, (4) undue prejudice to the opposing party, and (5) futility of amendment. *See Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Defendants oppose leave to amend, arguing that Plaintiffs have already amended their pleadings four times, and one of those amendments was after a hearing on Defendants' Motion to Dismiss the TAC. Defendants also point out that this case has been pending for over two years, yet it remains at the pleading stage. *See* ECF 1 (Complaint filed December 2017). These are compelling concerns, no doubt. On the other hand, this is the Court's first order assessing the sufficiency of Plaintiffs' pleading. *See United States v. United Healthcare Ins. Co.*, 848 F.3d 1161, 1183 (9th Cir. 2016) (reversing denial of leave to amend even though the plaintiff had previously amended his pleading three times). Moreover, "delay alone is not sufficient to justify the denial of . . . leave to amend," *DCD Programs, Ltd. v. Leighton*, 833 F.2d 183, 187 (9th Cir. 1987), and Defendants have not articulated any specific prejudice beyond the burden of continuing to defend this litigation. The Court therefore concludes that leave to amend is appropriate.

United States District Court
Northern District of California

### vi.   Jurisdictional Discovery

The Court also finds that Plaintiffs have justified their need for jurisdictional discovery and proffered a sufficiently narrow request. *See* ECF 165, 168.  As discussed above, in order to justify this Court's personal jurisdiction, Plaintiffs must plausibly allege that Defendants sent age-restricted ads to California residents.  Similarly, in order to establish their Article III standing, the Named Plaintiffs must plausibly allege the existence of at least some specific jobs for which they would have applied, but for the age restriction.  That is so even though the basis of their suit is that they never saw the challenged advertisements; they are not relieved of the requirement of showing they personally experienced injury in fact.  At the same time, the Court recognizes the difficulty of identifying advertisements that the entire Plaintiff Class was allegedly prevented from seeing; such information is not within Plaintiffs' possession and is difficult to obtain.  Thus, jurisdictional discovery will be helpful—if not necessary—to establish the jurisdictional facts identified in this order.  And although the 4AC has various deficiencies, the factual allegations contained therein are sufficiently specific and confined that jurisdictional discovery will not be a "fishing expedition," Reply at 6.

Accordingly, the Court will GRANT the request for jurisdictional discovery, as narrowed by Plaintiffs' Letter at ECF 168 to exclude ads that were not age-restricted.  The Court agrees with Defendants that non-age-restricted ads—while potentially relevant to the merits of Plaintiffs' claims—are not necessary to ascertain the jurisdictional facts, *see* ECF 166.  The Court is satisfied that Plaintiffs' narrowed request is not overbroad and will not unduly burden Defendants.

### vii.   Other Deficiencies in the Complaint

As usual, leave to amend is restricted to the defects discussed in this order and in Defendants' motion; Plaintiffs may not add new parties or claims without obtaining prior express leave of the Court.  However, the Court emphasizes that Plaintiffs are encouraged to address any issues raised in Defendants' motion to dismiss for failure to state claim, even though the Court lacks jurisdiction to formally adjudicate that motion.  In light of Plaintiffs' multiple prior amendments and the years this case has been pending, the Court will be reluctant to allow additional opportunities for amendment.  Hence, in the interest of efficiency and to guide Plaintiffs

United States District Court
Northern District of California

in making their amendments, the Court weighs in briefly on two of Defendants' arguments regarding the substantive sufficiency of Plaintiffs' claims.

First, Defendants contend that Plaintiffs cannot make out a disparate treatment claim under the ADEA, 29 U.S.C. § 623(a) (Count 2). *See* Mot. at 22-25.  Section 623(a)(1)[4] makes it unlawful for an employer "to fail or refuse to hire . . . any individual . . . because of such individual's age."  Although disparate treatment claims may also be based on "ad hoc, informal" discrimination, Plaintiffs allege a "formal, facially discriminatory policy," *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 610 (1993), namely: a practice of expressly excluding workers from being recruited based upon their age, *see* Opp. at 23.

The Supreme Court has stated in no uncertain terms that, "to establish a disparate-treatment claim under the plain language of the ADEA, . . . a plaintiff must prove that age was the 'but-for' cause of the employer's adverse decision."  *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).  That is, the ADEA does not permit "a mixed-motives age discrimination claim."  *Id.* at 175.  As the Supreme Court has further explained, "[a]n act or omission is not regarded as a cause of an event if the particular event would have occurred without it."  *Id.* at 177.  Defendants argue that Plaintiffs have not stated a disparate treatment claim because they cannot allege that "they would have been hired but for their age."  Mot. at 23.  This objection appears to have merit.

Plaintiffs respond that a plaintiff in an ADEA case is not required to plead the *McDonnell Douglas* factors for a prima facie case.  Opp. at 23 (citing *Sheppard v. David Evans & Assoc.*, 694 F.3d 1045, 1050 n.2 (9th Cir. 2012)).  True enough.  The reason is that *McDonnell Douglas* is a burden-shifting framework used in cases where direct evidence in unavailable.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002).  The *McDonnell Douglas* test is inapplicable where the plaintiff presents direct evidence of discrimination," including where a policy is "discriminatory on its face."  *Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985).  In other words,

---

[4] At the hearing, Plaintiffs confirmed that they are bringing only a disparate treatment claim and not a disparate impact claim. Tr. at 37-38.  Plaintiffs believe that 29 U.S.C. § 623(a)(2)—which has been held to be authorize disparate impact claims, *see Smith v. City of Jackson, Miss.*, 544 U.S. 228, 232 (2005)—also bars disparate treatment.  Whether that is true, however, is beyond the scope of this order, as 29 U.S.C. § 623(a)(1) indisputably provides for disparate treatment liability.

United States District Court
Northern District of California

Plaintiffs may ultimately prove by either direct or circumstantial evidence that age was the "but-for" cause of the challenged employer decision. *Gross*, 557 U.S. at 177. But that does not absolve Plaintiffs of pleading but-for causation, which is a necessary element of a disparate treatment claim.

As it currently stands, the 4AC does not appear to allege that Plaintiffs would have been hired but for the discriminatory advertising practice. Remember, *hiring* is the challenged employment decision under § 623(a). It is true, as Plaintiffs emphasize, that they have alleged an *advertising* policy that is "discriminatory on its face." Opp. at 23. But they have not alleged a facially discriminatory *hiring* policy. The Court accepts Plaintiffs' allegations that Defendants' advertising practices "cause[] a larger number of younger workers to apply for the jobs," which may then lead a larger number of younger workers to ultimately be hired. *See* Opp. at 24 (citing 4AC ¶ 171). But these allegations do not give rise to an inference that Defendants would refuse to hire older workers if they did apply, much less that Defendants would do so because of their age. Indeed, the 4AC contains few allegations pertaining to Defendants' hiring decisions, as opposed to the advertising practices. To be sure, a discriminatory recruiting policy could lead to or be a part of a discriminatory hiring policy; however, Plaintiffs have not made such allegations.

In addition, the Court is not convinced that Plaintiffs have stated a claim under the Unruh Act (Count 9). Defendants argue that "the Act does not reach employment advertising or hiring," Mot. at 13; *see also id.* at 25, and the Court believes they are likely correct. The Unruh Act guarantees "full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Cal. Civ. Code. § 51(b). Interpreting the phrase "business establishments," the California Supreme Court has held that "the Act does not cover 'the employer-employee relationship.'" *Alch v. Superior Court*, 122 Cal. App. 4th 339, 391 (2004) (quoting *Isbister v. Boys' Club of Santa Cruz, Inc.*, 40 Cal. 3d 72, 83 n.12 (1985)). That is, the Unruh Act forbids only discriminations by "made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers," which does not include employment discrimination. *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, 500 (1970). In the Court's view, Plaintiffs' conclusory allegation that information about Defendants' employment

United States District Court
Northern District of California

opportunities are among Defendants' "goods, services or facilities," 4AC ¶ 235, is not plausible. Though Plaintiffs are applicants rather than literal employees, their claims appear to relate to the employer-employee relationship rather than to, say the online goods that Amazon sells or the wireless services that T-Mobile offers.  Thus, the Court does not believe Plaintiffs have shown that they are "in a relationship with [Defendants] similar to that of the customer in the customer-proprietor relationship," *Strother v. S. California Permanente Med. Grp.*, 79 F.3d 859, 874 (9th Cir. 1996), as opposed to that of the employee in the employer-employee relationship.

None of the foregoing should be considered the Court's complete or final views on the sufficiency of Plaintiffs' claims.  Nevertheless, Plaintiffs are advised to remedy these likely problems in preparing the 5AC.

## IV.   ORDER

For the above reasons, the 4AC is DISMISSED WITH LEAVE TO AMEND and the request for jurisdictional discovery is GRANTED.  The parties shall develop a discovery plan and propose a deadline for Plaintiffs to file the 5AC.  Their proposed schedule shall be filed by March 20, 2020.  When the 5AC is filed, Plaintiffs are directed to include a redlined complaint as an attachment to the 5AC.

**IT IS SO ORDERED.**

Dated: March 13, 2020

_____
BETH LABSON FREEMAN
United States District Judge